```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

3    ------------------------------X
                                   :
4    UNITED STATES OF AMERICA,      :
                                   :   09-CR-00170 (SJ)
5             v.                    :
                                   :   July 15, 2014
6    JOSEPH ROMANO, et al,          :   Brooklyn, New York
                                   :
7                   Defendants.     :
                                   :
8    ------------------------------X

9

       TRANSCRIPT OF CRIMINAL CAUSE FOR RESTITUTION HEARING
10             BEFORE THE HONORABLE VERA M. SCANLON
                  UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13

     For the Government:        UNITED STATES ATTORNEY
14                              BY: CHRISTOPHER OTT, ESQ.
                                ASSISTANT U.S. ATTORNEY
15

16   For Defendant Romano:      MAURICE H. SERCARZ, ESQ.
                                Sercarz & Riopelle LLP
17                              152 West 57th Street, 24th Floor
                                New York, NY 10019
18

19   For Defendant Wells:       PETER J. TOMAO, ESQ.
                                Law Office of Peter J. Tomao
20                              226 Seventh Street, Suite 302
                                Garden City, New York 11530
21

     For Joseph Romano:         JOSEPH ROMANO, Pro Se
22

23

     Court Transcriber:         SHARI RIEMER
24                              TypeWrite Word Processing Service
                                211 N. Milton Road
25                              Saratoga Springs, New York 12866


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

I N D E X

|  | Direct | Cross | Redirect | Recross | Voir Dire |
|---|---|---|---|---|---|
| **WITNESSES** | | | | | |
| William Hessle | 5 (CO) | 25 (MS) | 82 (CO) | 83 (MS) | |
|  |  | 33 (JR) |  | 84 (PT) | |

CO – Christopher Ott
MS – Michael Sercarz
JR – Joseph Romano
PT – Peter Tomao

| **EXHIBITS** | Marked | Received |
|---|---|---|
| **GOVERNMENT'S:** | | |
| 1A    Binders | | 25 |
| 1B    Binders | | 25 |
| 1C    Victim records | | 33 |

1  (Proceedings began at 10:10 a.m.)

2          THE CLERK: This is 09-CR-170, <u>United States v.</u>

3  <u>Joseph Romano, et al.</u>

4          Can the attorneys please identify themselves?

5          MR. OTT:  Good morning, Your Honor.  Christopher Ott

6  on behalf of the United States.  I'm joined by counsel table

7  by Investigator Louis Hessle.

8          THE COURT: Good morning.

9          MR. SERCARZ:  For the defendant, Vincent Romano,

10  Maurice Sercarz, S-E-R-C-A-R-Z.  Vincent Romano has waived his

11  appearance at this hearing.

12          THE COURT: All right.  Mr. Romano.

13          MR. ROMANO:  Yes, good morning, Your Honor.  Joseph

14  Romano,  pro se.

15          THE COURT: Mr. Tomao.

16          MR. TOMAO:  Good morning, Your Honor.  Peter Tomao

17  on behalf of Kevin Wells.  Mr. Wells has waived his appearance

18  at this proceeding.

19          THE COURT: All right.  So just for the record, we

20  also have Michael Dibari and his counsel is Lawrence Carra.

21  There's a letter on the docket at 606 saying they were not

22  participating in these hearings.  We have Thomas Arnold,

23  counsel to Patrick O'Connell.  There's a letter at 607, the

24  same information.  There's an older letter at 597 about Mr.

25  Sal Romano and his counsel Brian Davis, more generally not

1  participating, and I think that's everybody.

2          Does anybody have any other information that anyone

3  wanted to be here isn't here?  Okay.

4          So we're here for the restitution hearing.  So at

5  least from what we talked about last time, the Government, I

6  think Mr. Ott, you were going to put on a witness very briefly

7  and then we were going to have some cross-examination.  Is

8  that right?

9          MR. OTT: That's right, Your Honor.

10          THE COURT: Anything else we need to talk about

11  before we start that?

12          MR. OTT: Very briefly, Your Honor.  Because of the

13  recording problems I just suggest that we just stay seated at

14  counsel table for --

15          THE COURT: For everyone you should do that.

16          MR. OTT: Otherwise then the Government calls a

17  witness.

18          THE COURT: Mr. why don't you come on up.  Bring your

19  material.  Just come up here.  You can stand for a minute.

20  Raise your right hand.

21          WILLIAM HESSLE, GOVERNMENT'S WITNESS, SWORN

22          THE COURT: Thanks.

23          THE CLERK: You can have a seat.  Spell your name for

24  the record.

25          THE WITNESS: William Hessel, H-E-S-S-L-E.

1        THE COURT: Mr. Ott, as you all saw we have that

2   microphone recording problem.  So if you can just make sure

3   you're speaking into the mic it would be great.  Thanks.

4        MR. OTT: Thank you, Your Honor.

5                        DIRECT EXAMINATION

6   BY MR. OTT:

7   Q.   Mr. Hessle, what is it that you do for a living, sir?

8   A.   I'm an investigator with the U.S. Attorney's Office for

9   the Eastern District of New York.

10  Q.   How long have you been doing that?

11  A.   About five years.

12  Q.   What did you do before that, sir?

13  A.   I was a U.S. Postal Inspector for 25 years.

14  Q.   In your position as an investigator  for the U.S.

15  Attorney's Office, did you have occasion to investigate Joseph

16  Romano and the companies that he ran?

17  A.   I did.

18  Q.   Based upon your investigation ultimately all the

19  defendants in that case, the case we're here for 09-CR-170

20  pleaded guilty; is that right?

21  A.   That's correct.

22  Q.   What was the nature of the scheme they pleaded guilty to,

23  Mr. Hessle?

24  A.   It was a mail fraud scheme involving the sale of coins.

25  Q.   After their guilty pleas and before also, you endeavored

1  to ascertain the value of the losses sustained by the victims

2  of these scheme; is that right?

3  A.   I did.

4  Q.   The victims usually fell into three situations. Can you

5  describe what they are to me briefly?

6  A.   Yes.  The three categories consisted of individuals that

7  had sold all their coins.  The second category would be those

8  that had sold some of their coins and the third category would

9  be those that had sold none of their coins.

10  Q.   Now, we're talking about coins that are bought through

11  telemarketing; is that right?

12  A.   Yes.

13  Q.   What was the nature of the fraud and how did it affect

14  the value of the coins?

15  A.   The fraud involved the pitch to individuals stating that

16  they were buying rare coins, that they were investors who were

17  going to purchase these coins following the completion of

18  their collections.

19  Q.   All right.  And what was the truth, however, about these

20  coins and the investors?

21  A.   Well, the coins were highly over graded and there were no

22  investors to purchase these coins.

23  Q.   When you say over graded --

24  A.   Over graded and over valued.

25  Q.   So ultimately the coins were worth less than what's being

1   paid for them?

2   A.    Yes.

3   Q.    Okay.  So in large part we're trying to figure out the

4   losses to the victims you're trying to ascertain what the true

5   value of the coins was; right?

6   A.    Yes.

7   Q.    Essentially the difference between what they paid and

8   what they're actually worth?

9   A.    Yes.

10  Q.    So let's talk a little bit about what you did to

11  determine what the losses were to the victims.  Can you

12  describe that to us, please?

13  A.    Yes.  The affidavits of loss were filed with the U.S.

14  Attorney's Office from victims that had purchased coins from

15  the subject companies.  It contained within those affidavits

16  was information as to how many coins they had purchased and if

17  in fact there were any compensation issues that they had to

18  disclose as far as insurance coverages for their loss and

19  things of that nature.

20  Q.    And also if they sold the coins; is that right?

21  A.    Yes.  On that affidavit for Joseph Romano people

22  disclosed that they had sold coins, if they had lost coins or

23  whatever.

24  Q.    Did you just take those affidavits at their face or did

25  you do further investigation into the losses incurred by the

1  victims?

2  A.   Well, a good deal of the affidavits that were submitted,

3  the affiants happened to have listed their -- the amount of

4  coins that they purchased as their loss amount as well.  So it

5  had to be determined obviously based upon records we had as to

6  how many purchases had been made, the dollar amounts that had

7  been made or in fact any of them had been sold to determine

8  the actual numbers.  So, in essence, we had a claimed loss

9  amount that was contained on the affidavit and then we also --

10 then also contained within that affidavit was again the

11 circumstances as to they sold them or they had been

12 compensated or something along that line.

13 Q.   Then you checked it with records you had which included

14 invoices, bank records, et cetera; correct?

15 A.   Yes.  Fortunately in the case of Joseph Romano and his

16 companies his computer actually had a database and within that

17 database from all of June of 2004 up until the takedown in

18 November of 2008 it appeared that every purchase that was made

19 was recorded on that computer.

20      In addition to that, from the search warrants that we

21 conducted we had invoices that we obtained.  There were also

22 documents that were submitted by the victims when they

23 submitted the loss affidavits and of course we had the

24 journals from the salesmen that listed every purchase that

25 they made and the date that the sale was made.

1   Q.   So that information as a starting point helped to

2   determine how much was spent on the coins; is that right?

3   A.   Yes.

4   Q.   And that's spent by the --

5   A.   Yes.

6   Q.   But as you mentioned there's actually retained value in

7   the coins; even though they were fraudulently inflated there's

8   some value to the individual coins; correct?

9   A.   Yes.

10  Q.   So what did you do to try to determine what the retained

11  value was for the purchases made?

12  A.   In order to come up with a formula in which we could

13  address the universe of affidavits that we had received we

14  took the information we had obtained from four victims and

15  those four victims had their coins appraised by reliable

16  individuals.  In one case the victim by the name of Lorne

17  Kramer, I picked up his coins in Virginia, brought them back

18  to New York and sent -- and hand delivered them to NGC in

19  Florida.  They authenticated --

20  Q.   I'm sorry to interrupt but NGC is acronym.  What does

21  that stand for?

22  A.   That's for Numismatic Guaranty Corporation.  It's one of

23  the two premier grading services offered in the field.

24  Q.   So you personally transmitted them, brought them to

25  Florida for NGC to do what with them?

A.   Well, what they do is they authenticate them and then they assign a grade to them and then following the grading by NGC those coins were presented to a [inaudible] Mr. Pier by the name of Anthony Swierteck and Mr. Swierteck assigned a value to the coins based upon the grade that was assigned by NGC.  Now, those were for victim Lorne Kramer's coins.

Now, during the course of the investigation there was a victim in California by the name of Lorraine Black.  She was in the process of trying to return coins to American Coin for credit and she had concerns because she was having difficulty with one of the salesmen there, a fellow who was using the name of Phil Kennedy.  I spoke with her and what she did was she forwarded me the coins that she was going to be returning. I took those coins upon receipt which was sent to me via registered mail and I took them to an expert in New Jersey by the name of John Albanese.  I had John Albanese grade the coins and photograph the coins and assign a value to them.  I took those -- those coins, repackaged them and posing as a letter carrier I delivered them to American, All American Coin.  I asked for a fellow by the name of Phil Kennedy and eventually Mr. Kennedy came to me who happened to have been in reality Thomas Arnold.  I presented those coins to him.  I got a signature and continued with the investigation.

I was advised by Mr. Albanese at the time or shortly thereafter that there was another victim by the name of Robert

1   Nesees and that Mr. Albanese had examined his coins, graded

2   those coins and assigned a value to those coins.  That was the

3   third victim.

4        The fourth victim was a fellow by the name of Poore who

5   resided in Minnesota.

6   Q.   That's Ernest Poore; correct?

7   A.   That's Ernest Poore.  I was not dealing with --

8   Q.   I'm sorry to interrupt again but Poore is P-O-O-R-E?

9   A.   That's correct.

10       I wasn't dealing with Mr. Poore.  I was dealing with his

11  son Lynn who resided in Memphis, Tennessee.  The father

12  actually lived in -- he was 92 I think.  He resided in

13  Minnesota.  I was advised by Mr. Poore that he had a number of

14  coins that he had purchased from All American Coin.  He had

15  taken them to another expert in the field, a fellow by the

16  name of Gary Atkin and Mr. Atkin had graded those coins and

17  signed a value to them.

18       So collectively of the -- from those four victims we had

19  approximately 2,200 coins which we were using as a sample.

20  Q.   And from those coins a value was assigned; correct?

21  A.   Yes.  Each of the -- Swierteck did one of the victims.

22  Albanese did two of the victims and Gary Atkins was the third

23  person that assigned a value to them as well as grade those

24  coins.

25  Q.   And ultimately from those values you're able to compare

1  those actual values to the sale prices; correct?

2  A.    Yes.

3  Q.    And from that you're able to figure out a ratio of value

4  to price?

5  A.    That's correct.

6  Q.    Then you endeavored to do a weighted average of that

7  value to price?

8  A.    Yes.

9  Q.    That weighted average was what?

10 A.    We actually addressed this issue twice.  In 2010 the

11 weighted value came out to be about 16.5 percent.  As the

12 investigation proceeded the price of the -- the intrinsic

13 value of the coins themselves, the silver had gone up

14 dramatically.  So in November of 2012 I had the individuals

15 that assigned values in 2008 again revisit those coins and

16 assign current values to them based upon the increase in the

17 price of silver.

18          THE COURT: What does it mean when you say the

19 weighted value?

20          THE WITNESS: It's a way of calculating the average.

21 If you were to take the -- let's say the four individual's

22 coins and average them -- and average them individually you

23 would come up with an unweighted number.  If you were to take

24 the total of all four and divide that by the total of the

25 value you'd come up with the weighted value.

1          In this case here the weighted value was higher than

2    the non weighted value.  So we used the weighted value, 16 --

3    I believe around 16.3 or 16.4 percent.

4    BY MR. OTT:

5    Q.    By using that higher value that means you were giving the

6    defendants greater credit for there being retained value in

7    the coins?

8    A.    Yes.

9    Q.    So ultimately that higher value to price percentage

10   results in a lower loss number?

11   A.    That's correct.

12   Q.    So I don't think we got to the -- I apologize if I

13   misheard it but ultimately after redoing the numbers in 2012

14   the percentage you came up with was 23.6 percent; is that

15   right?

16   A.    Yes.  We rounded it up to 24.

17   Q.    Again, to the -- to provide the benefit to the

18   defendants; is that right?

19   A.    Yes.

20   Q.    So did you review the Government's March 17, 2014 letter

21   to the Court on the restitution issue?

22   A.    I did.

23   Q.    And did you look at the two attachments, Attachments A

24   and B to --

25   A.    I did.

1  Q.   And do those represent your work product?

2  A.   Yes, sir.

3  Q.   What are they respectively?

4  A.   I'm sorry.

5  Q.   What is -- so I'm going to show you Attachment A.

6         THE COURT: Defense, do you have a copy?

7                    [Pause in proceedings.]

8  Q.   So we're now looking at A.  What is that, sir?

9  A.   This is titled a victim loss summary.  It's a nine-page

10 document listing 226 affidavits or victims based upon the

11 affidavits they submitted.

12 Q.   Ultimately this represents --

13        MR. SERCARZ: Judge, can we just have a moment to --

14        THE COURT: Yes.

15                    [Pause in proceedings.]

16        MR. SERCARZ: Thank you, Your Honor. I have

17 conferred.

18        THE COURT: Everybody has it -- all right.

19        MR. OTT: Also I have another copy if you folks need

20 them.  Mr. Sercarz, do you need another copy?

21        MR. SERCARZ: I'm good.

22 BY MR. OTT:

23 Q.   So we're -- you were describing what document, Attachment

24 A is.  Is that right?

25 A.   Yes.

1    Q.    You indicated what -- I apologize if I'm making you

2    repeat this.  Can you please describe what this document is

3    again?

4    A.    Yes.  It's a listing of the 226 indivi -- victims who

5    submitted loss affidavits for restitution purposes.

6    Q.    Proceeding through -- it's arranged in a table; is that

7    right?

8    A.    Yes, it is.

9    Q.    The victims are arranged alphabetically by their surname;

10   is that right?

11   A.    Yes.

12   Q.    But moving through the columns left to right -- sorry.

13          MR. OTT: Your Honor, do you have a copy?

14          THE COURT: Thanks.

15   Q.    Moving left to right through the columns if you could

16   just describe what each column is.

17   A.    Yes.  The first column it's a V number and that's the

18   victim number that was assigned by me as a way of tracking

19   them.

20       The second column is the Bates numbers that were assigned

21   the loss affidavits that were submitted.

22       The next column depicts the first purchase date of coins

23   made by the victims, and then the next column would be the

24   last purchase date of purchase of coins from the subject

25   companies by the victims.

1     The next company -- excuse me.  The next column is the

2  victim's last name followed by the victim's first name and

3  then in the very end there the -- it's the column that says

4  determined loss at 24 percent.  That's the loss that I

5  calculated based upon the formula that was derived.

6  Q.   Okay.  So can you just describe again what that process,

7  that mathematical process in the last column is doing?

8  A.   Yes.  That's taking the claimed loss number that they

9  submitted and it's being reduced by a number of factors first

10  and then the result is in most cases fact -- multiplied by .24

11  to -- excuse me, to come up with a determined loss amount.

12  Q.   And you said a number of other factors first before the

13  24 percent.  What were some of those factors?

14  A.   Well, I think in total we received about 230, 200 -- in

15  Joseph Roman's case maybe 235 affidavits of loss that were

16  submitted, and as is the case a lot of times there's confusion

17  as to who the subject companies are.  There's also confusion

18  on the part of some of the individuals, whether or not they

19  had even purchased coins from this company, and then of course

20  there's always the issue in which the amount that they

21  submitted as having purchased is different than the amount of

22  their loss or the amount that we have as far as documenting

23  the purchases.

24     So when you factor in all those things there's a lot of

25  subtractions being done here and then ultimately the finished

1  product being reduced by 76 percent.

2  Q.   So from that you -- that's how you came up with the

3  amount of loss suffered by the 226 victims in this case; is

4  that right?

5  A.   Yes.

6  Q.   Ultimately that loss is $19,070,401.25; is that right?

7  A.   Yes.

8  Q.   Just in terms of global numbers you have a fair amount of

9  experience with Joseph Romano's own records at his companies;

10  is that right?

11  A.   I do.

12  Q.   You're also familiar with the records of his suppliers

13  for the coins that he sold; is that right?

14  A.   Yes.

15  Q.   Based upon that, approximately how much did Joseph Romano

16  spend on the coins that he sold?

17  A.   Of the available records that we had I believe it was

18  about $9 million.

19  Q.   From the same records you know approximately how much his

20  customers spent to purchase those coins; is that right?

21  A.   Yes.

22  Q.   Approximately how much was that?

23  A.   That was around 40 million, $40 million.

24  Q.   So that's a difference of roughly $31 million?

25  A.   Yes.

1   Q.   And you determined through this process that the loss to

2   the victims was approximately $19 million; is that right?

3   A.   Yes.  Keep something in mind that $40 million represented

4   the amount paid by all of the victims.  We amount we come up

5   with restitution for is only for the 226 that submitted

6   affidavits of loss.

7   Q.   Right.  So turning your attention to what was Attachment

8   B to the Government's earlier letter, do you have that?

9   A.   No, I don't.

10  Q.   Here we go.

11         MR. OTT:  Counsel and the Court should already have

12  a copy of that.

13  Q.   So can you just identify what that document is, Mr.

14  Hessle?

15  A.   Yes.  These are the -- as I mentioned previously, this

16  reflects the four victims whose coins we used in the formula

17  to determine or to apply to the universe of losses here.  It

18  depicts the victim's name, the purchase price, the appraised

19  value which is based upon the experts that assigned those

20  values, the value to price which is the -- essentially just

21  dividing the 1658 in the first column of Lorraine Black by

22  14,000 to come up with 11.84 percent and then in the final

23  column that would be the appraiser that actually did the

24  evaluation, and this is for the September 2012 review.

25  Q.   So then that has the higher silver value and therefore

1  the higher retained value; right?

2  A.    Yes.  If I could, Your Honor, on this document if you

3  look at -- where under each of those columns it has a total

4  and it says 17.47 percent, that's derived from an unweighted

5  average.  When you look at the bottom and it says weighted

6  average just look at the totals, 219 divided by 931 and that's

7  the weighted average.

8  Q.    So through the combination of Attachments A and B to the

9  Government's earlier letter that represents the methodology

10 used by the Government in coming up with the approximately $19

11 million loss number; is that right?

12 A.    Yes.

13 Q.    That is $19 million in loss for 226 victims who self

14 identified?

15 A.    Yes.

16 Q.    Thank you, Mr. Hessle.

17         THE COURT: Let me just Mr. -- one question.  In the

18 other Romano case in the restitution opinion which I imagine

19 everyone's here there was the unanswered question about why

20 the numbers that were the loss and what was thought -- what

21 could be documented as having spent basically didn't kind of

22 match up.  It was sort of -- we don't know.  There was an

23 argument that was raised by counsel look, the amount of money

24 spent is -- doesn't support the percentage but if I'm right,

25 if the number is 23.6 percent so the nine million to the 40

1  million you're getting approximately the same ratio.  So in

2  this -- the records that are the same match up?

3            THE WITNESS: Yes.  In large part --

4            THE COURT: Is there anything else to be said about

5  that then?

6            MR. OTT:  Just very briefly I guess through the

7  witness would be the appropriate way to do that.

8  BY MR. OTT:

9  Q.   You were also the investigator in Michael Romano's case;

10 is that right?

11 A.   I was.

12 Q.   Is there any difference in the amount -- I'm sorry.  In

13 the amount of documentation that you were able to recover in

14 either case about the costs of the coins?

15 A.   In the Michael Romano case we were able to document $13

16 million in purchases on sales of about $37 million.  As far as

17 additional documentation it's essentially the same.  It's

18 documentation as to invoices and computers and things of that

19 nature.

20 Q.   Now, you were able to recover Joseph Romano's database in

21 this case; is that right?

22 A.   Yes.

23 Q.   You mentioned that that included sales.  Did it also

24 include information about the costs of the coins to

25 wholesalers?

A.    Not the cost -- the purchase price.  It listed the
purchase price and those records as I said were available all
the way through June 2004.  Prior to that there were no
computer records.

Q.    Thank you.

          THE COURT: Mr. Sercarz.

          MR. SERCARZ: Thank you, Your Honor.  Your Honor, I
assume that the -- when the Court resolves these issues it
will be considering in addition to the testimony that we
adduce here by stipulation all of the testimony of the prior
hearing as well.  I made the application and I thought it was
granted to have those witnesses called on Michael Romano's
behalf and their testimony incorporated by reference and my
cross-examinations of Mr. Swierteck incorporated by reference.
Is that --

          THE COURT: I think we resolved that but, Mr. Ott,
you're in agreement?

          MR. OTT: Yes.  I have no objection, Your Honor.

          THE COURT: And then Swierteck.  What about -- there
was a statistician?

          MR. SERCARZ:  Yes, Your Honor, who's -- forgive me.
Whose name escapes me.  And we called our own expert.  I
believe it was Mr. Ganz to talk about that.

          THE COURT: So all three of the examinations you want
considered here?

1      MR. SERCARZ: Yes.  The statistician's name is

2  Glickman.  Joseph Romano reminded me.

3      May I inquire just briefly of --

4      THE COURT: Just one -- so Mr. Ott is there any issue

5  with us considering the Ganz and the Glickman testimony in

6  this case?

7      MR. OTT: No, Your Honor.

8      THE COURT: Let me just ask.  I have these binders.

9  These are the -- did you want -- are you moving them, are you

10  giving them to me?

11      MR. OTT:  That's just a record of what the discovery

12  was thus far.  Among other things when we talk about the

13  testimony of Swierteck, that's in there.

14      THE COURT: But are these the victim's affidavits as

15  well?

16      MR. OTT: They are.  They're in there.

17      MR. SERCARZ: I would have no objection if they're

18  made a part of the hearing as though they were offered, Mr.

19  Ott, if that's what you --

20      MR. OTT: Then the Government moves for those two

21  binders which we'll mark as Government's Exhibit 1 for the

22  purposes of this hearing.

23      THE COURT: Okay.  Do you need any information from

24  your witness in connection with that?

25      MR. OTT:  Let me -- come up here with copies, with

1   the two binders.

2   BY MR. OTT:

3   Q.   If you could just take a moment, Mr. Hessle, to look

4   through those.

5                    [Pause in proceedings.]

6   Q.   Did you have an opportunity to look through those?

7   A.   I did.

8   Q.   What are they?

9   A.   Those are the affidavits and documents related to the

10  restitution matter at hand.

11  Q.   In fact, do they appear to be the documents you provided

12  to me in preparation for this hearing?

13  A.   Yes.

14  Q.   And does it appear to be a full set of the affidavits?

15  A.   As far as I can tell, yes.

16            MR. OTT: Then the Government moves for admission of

17  the two binders as Government's Exhibits, let's say for --

18  let's say because there are two binders, 1A and 1B.

19            THE COURT: For the defendants.

20            MR. SERCARZ: No objection.

21            MR. ROMANO:  Your Honor, I object to that.  I do not

22  think that any of these people that are considered experts in

23  a previous hearing should be entered into this hearing.  I --

24  this Court did not deem them experts and nor do I know the

25  methodology of these people.  So I want to put that on the

1   record that I'm objecting to them being entered into it.

2       The only thing was last time we were in this

3   courtroom what I agreed to was that we would bring in the

4   statisticians who was Mr. Glickman, Dr. Glickman, and Mr. Ganz

5   who was the coin expert.  I did not agree to bringing in this

6   John Albanese, Swierteck or any of the other -- Gary Atkins.

7       THE COURT: Mr. Tomao, what's your position?

8       MR. TOMAO: Your Honor, I have no objection to them

9   coming in.

10      THE COURT: I thought we talked about who you wanted

11  to cross examine the last time and you just asked for Mr.

12  Hessle.

13      MR. ROMANO:  Well, it seemed to me when we came last

14  time we kind of brushed over everything that we talked about

15  previously.  We talked about me getting a counsel to represent

16  me in this hearing. We talked about a lot of things that just

17  completely got washed over and yes, I do want to question Mr.

18  Hessle if that's who you're going to bring in but it seems

19  that the argument of contention here is constantly they don't

20  want to bring anybody in here.  They want to just work off

21  some other hearing.  They refer to my brother's case as the

22  sister company.  We both operated two separate companies.

23  Just because we are brothers and we share the same name does

24  not mean we ran the same exact operation and each case should

25  be handled individually.

 1          THE COURT: Let me ask, Mr. Ott.  Was the information

 2   about those -- the other two experts, the --

 3          MR. OTT: It was provided in the first --

 4          THE COURT: Albanese and Atkins was provided?

 5          MR. OTT: Yes.  It was also provided in the first

 6   letter, the March 17th letter which includes Attachment B which

 7   discusses them.  So, yes, it's been provided consistently

 8   throughout, Your Honor, for the last four months.

 9          THE COURT: So I'm going to accept the Government's

10   offer of these documents and just so this record is clear from

11   our last hearing which was -- appearance which was on June 17th

12   the transcript is filed at 610 and Mr. Romano said I would

13   like to only cross-examine Agent Hessle.  I've read the

14   transcripts and I'm okay with Mr. Sercarz's examination of all

15   the previous witnesses in this.

16          (Government's Exhibit 1A and 1B received.)

17          THE COURT: So, Mr. Sercarz.

18          MR. SERCARZ: Thank you.

19                       CROSS-EXAMINATION

20   BY MR. SERCARZ:

21   Q.   Good morning, Agent Hessle.

22   A.   Good morning.

23   Q.   Agent, if you could take a look at Exhibit B for purposes

24   of the hearing, I understand that you took Lorraine Black's

25   coins and gave them to John Albanese for purposes of

1  appraisal.  Is that correct?  Do you have that in front of

2  you?

3  A.    Yup.  Yes.

4  Q.    And after examining her coins the value to price ratio

5  for her coins was 11.84 percent; is that correct?

6  A.    Yes.

7  Q.    Okay.  The same expert, John Albanese, was called upon to

8  examine the coins of Robert Nesees; is that correct?

9  A.    Yes.

10 Q.    And the same expert found that the value to price ratio

11 of Mr. Nesees coins was 30.15 percent, about two-and-a-half

12 times as great a value; is that correct?

13 Q.    Yes.

14 Q.    The experts who examined the coins in this case came up

15 with value to price ratios that ranged from 11.66 percent to

16 30.15 percent; is that correct?

17 A.    Yes.

18 Q.    Am I correct that there was nothing that you discovered

19 during the course of the investigation that suggested that the

20 coins were being over graded by the same numerical amount or

21 that they were being over valued by a constant percentage; am

22 I correct?

23 A.    Could you restate that?

24 Q.    Sure.  During the course of your investigation you didn't

25 discover anything that suggested that all coins were being

1  over valued by, and I'm using a hypothetical here, two grade

2  points, three grade points, four grade points but a consistent

3  amount; am I right?

4  A.    The only -- these are the values that we used, period.

5  Q.    And you have no other information regarding the amount by

6  which the coins were either over graded or over valued; is

7  that correct?

8  A.    Regarding these four individuals, that's correct.

9  Q.    Now, in this case as opposed to the Michael Romano

10 case -- we'll leave the Michael Romano case to one side.  You

11 took a sample based on the coins of four individuals, is that

12 correct, the value to price ratio?

13 A.    We took the four values that we had, the four knowns.  We

14 didn't take -- it wasn't a sample -- these were the four

15 individuals that we had.  We didn't select these from other

16 people.

17 Q.    Understood.  And the ratio, the weighted average of these

18 four people is being applied to all of those individuals who

19 submitted affidavits of loss; is that correct?

20 A.    Yes.

21 Q.    And they number approximately 230 some odd; is that

22 correct?

23 A.    226, yes.

24 Q.    Now, with regard to Exhibit A, the victim loss summary, I

25 note that there's a dollar figure at the end which indicates

1  when applying the value to price ratio how much was allegedly

2  lost in value as to each of these customers; correct?

3  A.    Yes.

4  Q.    My question is this, and you may have stated this and I

5  may just not have heard you.  Is the amount that these

6  individuals allegedly paid for their coins, was that

7  determined using invoices or using the affidavits of loss?

8  A.    In determining how much they actually purchased, is that

9  your question?

10  Q.    Yes.

11  A.    The individuals when they submitted the affidavits said

12  how much they had purchased.  We had based upon the computer,

13  based upon everything else, we had a ballpark figure as to how

14  much it should be -- as far as documentation.  We could

15  document this amount.  There are -- there are many individuals

16  who surely did not give us a number that was equal to the

17  amount that we could document.  In some cases the amount they

18  submitted was more then we could document and that would --

19  attributed to the fact that they were earlier purchases to

20  which we have no records.  I can't dispute them.

21      In some cases they were less and in cases in which they

22  said they had purchased less that loss number was based upon

23  their lesser number and not the higher number that we knew

24  they had purchased.  Is that your question?

25  Q.    Yes.  I'm going to try to refine it a little bit.

1    First of all, there were some instances, were there not,

2    in which people claimed to have purchased coins from one of

3    the Joseph Romano subject companies and that turned out not to

4    be the case; am I right?

5    A.    That's correct.

6    Q.    But if the Court were to look at any one of these victim

7    loss amounts, for example number one, Abila, A-B-I-L-A, and

8    Kerrigan, K-E-R-R-I-G-A-N, we don't know whether the amount

9    that they allegedly paid for their coins is based upon their

10   affidavit, invoices or some combination thereof. Is it fair to

11   say?

12   A.    Fair.

13   Q.    And we don't know whether that amount is accurate.  Fair

14   to say?

15   A.    On this sheet you don't know whether it's accurate,

16   that's correct.

17   Q.    So we're taking the weighted average of 24 percent and

18   applying that to a purchase price whose accuracy is unknown in

19   order to determine the loss amount for each victim whose name

20   appears on the victim loss summary.  Is that correct?

21   A.    As depicted on this chart.  I happen to know how much the

22   additional information and it is accurate.

23   Q.    Okay.  With regard to the coins that were evaluated by

24   the experts in order to determine the value of the victim's

25   coins for Exhibit B, in some instances these individuals

1   returned coins that were purchased more than five years

2   earlier.  Is that correct?

3   A.   Could you ask that question again?

4   Q.   Yes.  Let me back -- that was a confusing question and I

5   apologize.

6        You testified that you obtained the coins of Lorraine

7   Black, Lorne Kramer, Robert Nesees and Ernest Poore and

8   submitted them to experts for evaluation.

9   A.   No, that's not what I said.

10  Q.   I'm sorry.  Did you obtain the coins from each of these

11  four individuals?

12  A.   I obtained the coins from Lorraine Black and from Lorne

13  Kramer.  I never obtained the coins from Robert Nesees nor

14  Ernest Poore.

15  Q.   How did the Nesees and Poore coins make their way to

16  experts for evaluation?

17  A.   They were delivered to John Albanese.

18  Q.   They were delivered direct to Albanese?

19  A.   I'm assuming directly, yes.

20  Q.   We don't know whether during the period of time that

21  Black, Kramer, Nesees and Poore were in possession of the

22  coins, we don't know whether they were damaged in any way

23  while they were in the custody of the individuals who

24  purchased them; isn't that correct?

25  A.   That's correct.

1  Q.   In many instances by the time these coins were evaluated

2  by experts they had been purchased years earlier; am I

3  correct?

4  A.   Yes, they were earlier purchases.

5  Q.   We don't even know whether the coins that were sent to

6  the experts were eval -- for evaluation were in each instance

7  the same coins that were purchased from the Joseph Romano

8  companies; isn't that correct?

9  A.   Correct.  The only thing we have to support that is the

10  fact that the invoices were submitted along with the coins.

11  Q.   And am I also correct that during the period between the

12  time that coins were purchased and the time that coins were

13  evaluated the value of precious coins fluctuated?

14  A.   Yes, it did.

15           MR. SERCARZ:  I have no further questions at this

16  time.

17           THE COURT: Mr. Tomao, do you have any examination?

18           MR. TOMAO: No, Your Honor.

19           THE COURT: Mr. Romano?

20           MR. ROMANO: Yes, Your Honor.  If you will just give

21  me one minute to speak with Mr. Sercarz.

22           THE COURT: Sure.

23                    [Pause in proceedings.]

24           MR. TOMAO:  Your Honor, if I may, after talking with

25  the prosecutor, we're going to offer as an exhibit what we

1  call C so it doesn't get confusing, a document I received from

2  the U.S. Attorney's Office which documents the victim

3  affidavit submitted that we used to compute the restitution

4  order for Kevin Wells which is as you recall was less than $19

5  million.  It's I think $14,677,042.51.  I believe that Mr. Ott

6  has agreed that this is an accurate copy of it and we'll make

7  it -- we'd like to make it part of the record.  We'll submit

8  it ECF after the hearing.

9           THE COURT: Mr. Ott.

10          MR. OTT: No objection.  Just by way of context that

11 Mr. Tomao's client that was involved with a shorter time range

12 but with that said that's fine.  We have no objection to the

13 document coming in as to his specific client.

14          THE COURT: So we'll accept that document, Mr. Tomao,

15 you're going to submit as Exhibit --

16          MR. TOMAO: C.

17          THE COURT:  -- C; is that right?

18          MR. TOMAO:  Is that okay?

19          THE COURT: These binders are what -- the binders

20 are?

21          MR. SERCARZ:  1A and 1B.

22          THE COURT: Then the others are A, B, C?

23          MR. SERCARZ:  I apologize, Your Honor.  My stickers

24 got taken away from me just before I got here.  I'm getting

25 some --

1       (Government's Exhibit C received.)

2               THE COURT: Anything else, Mr. Tomao?

3               MR. TOMAO: No, Your Honor.  Thank you.

4               THE COURT: Mr. Romano.

5               MR. ROMANO: Yes.

6                       CROSS-EXAMINATION

7   BY MR. ROMANO:

8   Q.    Good morning, Mr. Hessle.

9   A.    Good morning.

10  Q.    Mr. Hessle, I'm having trouble understanding a few things

11  here.  I'm a little confused.  You're saying that there's 220

12  victims, these are my customers and you have -- the question

13  is you have four people who gave you coins that you've

14  evaluated --

15  A.    As I said --

16  Q.    -- or that you had evaluated?

17              THE COURT: One person at a time.

18              MR. ROMANO: I'm sorry.

19  A.    They didn't give me the coins.  Those are the four

20  victims whose coins were used in determining the percentage to

21  be applied to the universe.

22  Q.    When you say the universe you're talking about --

23  A.    The 226 affidavits.

24  Q.    226 affidavits.  Now, you were a little vague with the

25  affidavits.  You --

1      THE COURT: All right.  No commentary.  Cross-
2  examination.
3      MR. ROMANO: I apologize, Your Honor.
4  BY MR. ROMANO:
5  Q.   When you spoke to these people was it difficult to see
6  what they -- to get this information?
7  A.   Initially the affidavits provided a good deal of the
8  information that we already needed.  It was the exceptions or
9  the challenge to what was in some of the affidavits that
10  required us to speak personally with the affiant.
11  Q.   And you spoke personally with these people?
12  A.   I spoke with many of those people.  Not all of those
13  people.
14  Q.   Do you have a number of how many people you spoke to?
15  A.   No.
16  Q.   Did anybody else from your office speak with these
17  people?
18  A.   Not that I'm aware of.
19  Q.   So wouldn't you say -- you say submitted affidavits.  You
20  mean you solicited affidavits from these people?
21  A.   Yes.  The victim notification service from the U.S.
22  Attorney's Office is required to send out affidavits --
23  notices of affidavits of loss for potential people who could
24  recoup some of their losses.  They sent those affidavits out.
25  Q.   So just so I understand how this works.  You're the head

1  investigator of -- in this case?

2  A.   Yes.

3  Q.   It's pretty much run by you with an exception of the

4  prosecutor?

5  A.   The cases that -- it's not run by me.  I do the

6  investigative end of the case.  The case is pretty much

7  controlled by the prosecutors as to the direction that we're

8  going in and the needs -- whatever they'll need to accomplish

9  their goals.

10 Q.   So they send out a letter that you're aware of?

11 A.   The Eastern District of New York sends out a victim

12 notification letter basically saying that you've been

13 identified as a victim in this case and they were already

14 charted and numbered as a possible victim and then these

15 affidavits were sent out to all the potential victims and in

16 return 235 of them or so replied.  209 of them were discounted

17 because for whatever reasons they where incomplete or the

18 companies they're alleging to have losses from weren't yours.

19 So we discounted those right away.

20 Q.   See, this is where I'm having trouble understanding this.

21 In other words, there's no coins; there's just the coins from

22 just these two people, Lorraine Black and Lorne Kramer?

23 A.   No.  The coins are from the four victims.

24 Q.   Four people.

25 A.   Yes.

Q.   Okay.  And you're going to apply this 24 percent to the

other 200 or plus people.

A.   Yes.

Q.   Is that what you're saying?

A.   Yes.

Q.   And this is where I'm confused.  Do you know the

difference between -- well, let's use these names that you

have here.  Do you know the difference between Lorraine

Black's coins to this Vern and Joanne?  Do you know the

difference between that?  In other words, are the coins -- do

they have some kind of marking, maybe my initials on it?

A.    I never saw those coins so I couldn't tell you what

markings or whatever notations are, no.

Q.   So you don't know actually if any of these coins even

belong to me?

A.   I know based upon the records we have that you sold Abila

$95,000.00 worth of coins and we have the records to support

that.

Q.   Did you want me to take your word for that?

A.   Those are all in the information that we turned over to

you.

Q.   Okay.

A.   If you go through the bank records and you go through

everything --

            THE COURT: All right.  Hold on.

1  A.   -- else it's there.

2         THE COURT: Hold on.  This is cross-examination.

3  This is not an argument.  You ask the question, he'll answer

4  it.  So this kind of rhetorical question do you want me to

5  take your word for it is not an acceptable question.  Ask him

6  about information, he'll respond.

7         MR. ROMANO: I apologize, Your Honor.

8  BY MR. ROMANO:

9  Q.   So we have -- we have, Mr. Hessle, four people who

10 submitted coins in one way or another in like you say in

11 Lorraine Black you went and picked up the coins and delivered

12 them to a place in Florida.  Correct?

13 A.   No.  Lorraine Black contacted us because she was having

14 issues with Phil Kennedy from your office.  She wanted her

15 $14,000.00 back and they were insisted upon the return of the

16 coins.  She sent the coins to me via registered mail. I

17 dressed up as a mailman, went into your business undercover

18 and I asked for Phil Kennedy.  Your brother, who said he was

19 the owner, said there's no Phil Kennedy here and I says well,

20 you're not getting this package and he said to me oh, wait a

21 minute, let me check in the back, and that's when Tom Arnold

22 came out as Phil Kennedy.

23        MR. SERCARZ:  Your Honor, can we have the name of

24 the brother that --

25        THE WITNESS: Vincent.

1  BY MR. ROMANO:

2  Q.    So that's how you ended up with Lorraine Black's coins?

3  A.    Yes.

4  Q.    Did they take back the coins or you took the coins?

5  A.    No, I -- the whole thing was filmed.  It was given back

6  to Phil Kennedy and they took the coins back after they had

7  been examined and graded by John Albanese.

8  Q.    Right.  That's the issue I'm trying to get to here.  When

9  they -- how did they get to John Albanese?

10 A.    By me.  Ms. Black sent the coins to me via registered

11 mail.  I went to New Jersey.  I talked to John Albanese.  He

12 examined them.  He photographed them.  Put a value on them.  I

13 got in my car and delivered them to Phil Kennedy.

14 Q.    Okay . And John Albanese is -- you turned over a letter.

15 This is the John Albanese of Route 202 in Far Hills Mall, PO

16 Box 1776 in Far Hills, New Jersey?

17 A.    Yes.  I believe that's his address off the top of my

18 head.

19         THE COURT: Only one person at a time.  Let him

20 finish the answer.  Okay.  Go ahead.

21 Q.    This is a letter congratulating him on a job well done in

22 in helping the Bureau of Investigation secure as they were 27

23 guilty pleas recovering $6 million in restitution that was

24 signed by the Attorney General's Office by Mr. Eliot Spitzer.

25 Are you familiar with that?

1  A.   No, I'm not.  I don't -- unless that was part of his

2  biography or something but --

3              THE COURT: Mr. Sercarz --

4          MR. SERCARZ:  Your Honor, Joseph is going to have to

5  stay at defense table when he's asking -- do you want me to

6  show the witness or the Court?

7          MR. ROMANO:  Please, the witness, the Court.  They

8  should all get some copies I'm sure.  I just want to establish

9  if it's the same John Albanese.

10             MR. SERCARZ:  Your Honor, in your folder it's REST-

11 15.

12             THE COURT: All right.

13                  [Pause in proceedings.]

14 I recognize this, Your Honor.

15             THE COURT: All right.  We're looking at Document

16 that's marked by the Government REST-0013.  What's the

17 question?

18             MR. ROMANO: The question was if that's the same Mr.

19 John Albanese, the one who received the letter from Eliot

20 Spitzer congratulating him on helping him secure 27

21 convictions.

22 A.   I believe it is.

23 Q.   Okay.  Thank you.

24             THE COURT: So we're going to get you back that copy.

25 BY MR. ROMANO:

1  Q.    You said that you spoke with Phil Kennedy.  You mean you

2  spoke with him after my brother Vincent went and got him from

3  the back office and brought him up front?

4  A.    That's correct.

5  Q.    Did you speak with him any other time?

6  A.    Not that I'm aware of, no.

7  Q.    You never questioned him?

8  A.    Tom Arnold, no.

9  Q.    Yes.

10 A.    No.

11 Q.    Is he not a cooperating witness?

12         MR. OTT:  Objection.  Relevance.

13         THE COURT: Mr. Romano, what's the relevance?

14         MR. ROMANO: The relevance is I want to know if he

15 had spoke with Mr. Kennedy any time afterwards or during this

16 because I'm unsure of what he was saying when he says he

17 learned from Tom Arnold certain questions he was asked.

18         MR. OTT:  Same objection.

19         THE COURT: Yes.  The objection is sustained.

20 BY MR. ROMANO:

21 Q.    Tell me about Robert Nesees and Ernest Poore, Mr. Hessle.

22 Did they -- how did John Albanese and Gary Atkins -- we'll

23 start with John Albanese.  How did John Albanese get Robert

24 Nesees' coins?

25 A.    John Albanese is an advocate for victims of coin fraud

1   and somehow Mr. Nesees probably through his attorney or

2   someone, I'm not even sure how, contacted Mr. Albanese and the

3   law firm that he's associated with and from there the

4   relationship began as far as turning over the coins and the

5   examination by Mr. Albanese.

6   Q.   So that's still -- maybe you can break that down for me.

7   Did Mr. Nesees hand deliver these to Mr. Albanese?

8   A.   I have no idea.

9   Q.   You understand, sir, that we're talking about grades of

10  coins here.  I think that's the argument is the grades of the

11  coins and putting a value to them.  So when I -- if I were to

12  pass you a coin and you dropped it on the floor depending on

13  how damaged that coin had become that would drastically change

14  the grade; is that correct?

15  A.   It's possible.

16  Q.   Okay.  So what I want to know is what the chain of

17  custody is on delivering these coins to these -- to John

18  Albanese or Anthony Swierteck or Gary Atkins and you don't

19  know that.  In other words, they had the coins is what you're

20  saying, Albanese had coins in front of him.

21  A.   Albanese was presented the coins.

22  Q.   So he was presented the coins and Albanese put a grade on

23  these coins?

24  A.   He did and he valued them too.

25  Q.   I'm sorry.  Say again.

1  A.    He valued them as well.

2  Q.    And he valued them as well?

3  A.    Uh-huh.

4  Q.    He didn't pass them off to Swierteck or someone else to

5  value them?

6  A.    As I explained, Swierteck in this particular case only

7  did the valuation on 342 coins of Lorne Kramer.  Lorne Kramer

8  lived in Virginia.  I went to Virginia, picked up Lorne

9  Kramer's coins, brought them back to New York, got on a plane,

10  flew to Florida and presented them to NGC.  NGC, that's

11  Numismatic Guaranty Corporation, sent them back to me via

12  registered mail and they were presented to Mr. Swierteck who

13  assigned a value to them.

14  Q.    Thank you.  Did -- do you know how he went about finding

15  the grade of these coins?

16  A.    I'm not a grader.  I have no idea.

17  Q.    Do you -- in other words, there's no method that Mr.

18  Albanese used to find out the grades?  Were there any sheets

19  or any lists?

20  A.    I don't know how Mr. Albanese conducted his business.  I

21  don't know how Mr. Gary Atkins conducted his business.  I do

22  know that especially in the case of Mr. Albanese he's renowned

23  in the field and his reputation is second to none.

24  Q.    Yes.  There's a lot of people that are renowned in their

25  field and it's possible they make mistakes.  I mean we just

1   looked at a letter from Eliot Spitzer.  I'm saying to you is

2   there -- there is nobody -- that nobody knows how this man

3   came up with a number.  You said that he looked at the coins,

4   he came up with a grade and he put a number on them, a price.

5   How?  I don't understand that.  I don't even know how I would

6   do it.  How did he come up with a price?

7   A.   I do not -- I've heard of the methods that it's done.

8   I've never done it so for me to venture and -- a speculatory

9   answer as to how Albanese did it I don't think that would be

10  fair.

11  Q.   Yes.  No, I don't want you to speculate.  I just -- I

12  just wanted to know if you knew if he had any sort of

13  methodology to coming up with these numbers.

14  A.   No.  We'd have to ask him.

15  Q.   Yes, we would.

16          MR. ROMANO:  If you can give me one minute, Your

17  Honor. I need to speak with Mr. Sercarz.

18          THE COURT: Sure.

19                  [Pause in proceedings.]

20          MR. ROMANO: Okay.  I apologize, Mr. Hessle.

21  BY MR. ROMANO:

22  Q.   Mr. Hessle, you've said that some of these people, and

23  I've read all the transcripts in my brother's case.  You've

24  said that they were vulnerable.  Is that correct?

25  A.   Yes.

1        THE COURT: You're talking about the victims?

2        MR. ROMANO: I'm going to call them customers because

3   I don't see a crime committed.

4        THE COURT: So we're talking about the affiants of

5   the victim loss affidavits.  That's what we're talking about.

6   We're moving on.

7        MR. ROMANO: Yes.  Yes.

8        THE COURT: Vulnerable.  What's the question?

9   BY MR. ROMANO:

10  Q.   You said yes, you believe they were vulnerable.

11  A.   That's correct.

12  Q.   And that they were elderly?

13  A.   Yes.

14  Q.   And they were confused easily?

15  A.   Yes.

16  Q.   When you called them up, and I'm assuming that's how --

17  you know what I'm talking about, the people that you called,

18  I'm assuming you called them.  Were they confused when you

19  called them?

20       In other words, let me break that down for you.  You call

21  up and you say I'm Bill Hessle with the postal inspectors.  We

22  think you've been defrauded in buying coins.

23  A.   No, that wouldn't be the way it would be done.  We call

24  up, identify myself as an investor for the postal inspection

25  service and it probably went because I don't recall offhand

but it probably went somewhere along the line where did you

purchase coins from American Coin, All American Coin or from

Last Quarter Coin, and if you did when did you purchase them.

And then just basically let them go from there.

Q.    Okay.  How old were the people you spoke with?

A.    The average age was 74.

Q.    74.  And if someone bought coins from me in 2001 and they

were 74 -- they're 74 in 2008 and now it's -- they're 74 in

2008 when they bought coins from me in 2001 they were a lot --

they were a few years younger; am I correct in saying that?

A.    Yes.

Q.    Now, is there any way of you telling whether or not these

people were confused when I sold them in 2001 as you say?

          MR. OTT: Objection.  Relevance.

          THE COURT: Denied.

A.    I have no way of knowing -- first of all, I don't

think -- when you say when I sold them you're talking about

your salesman.

Q.    Yes.

A.    I have no recollection of people that I discussed as far

as being sold to in 2001.

Q.    Or 2002 or 2003.  Again it's a hypothetical question like

Mr. Ott said.  I'm just saying to you if you spoke with

somebody who you believed to be confused do you know if they

were confused in 2008 and 2007 and 2003 and '04?

1  A.   Again, what's -- you're asking me to speculate.  I can

2  tell you this, that I've spoken with hundreds of people that

3  bought coins from you and a good deal of my assessments were

4  made from speaking with those people and whatever information

5  they had that proved -- that had invoices or whatever we took

6  all that into account.

7  Q.   When you spoke to these people, did you suggest to them

8  that they might get money back?

9  A.   When I -- are you talking about when I'm doing the

10 investigation or are you talking about at the restitution

11 phase?

12 Q.   Whenever you're talking to the people did you tell them

13 look, you could have been defrauded and there's a chance you

14 might get money back?

15 A.   When I spoke with people about restitution that opens the

16 door to all kinds of questions as to can I get my money back,

17 can I do this, and the answer you give people when it comes to

18 restitution is that restitution is part of an individual's

19 sentence and restitution is ordered.  It's at the discretion

20 of the court as to whether or not you will receive anything or

21 if there is in fact anything to be restored or anything to

22 make people whole with.

23      So no, to make someone a promise that they're going to

24 get their money back, and I'm assuming you're alluding to the

25 fact that in exchange for testimony or exchange for something

1    that they come forward, I don't -- I don't know where you're

2    going.

3    Q.   No.   I'm only asking --

4         THE COURT: Again, it's a question and an answer to

5    the question and not an argument going one direction or the

6    other.  So what's your question, Mr. Romano?

7    BY MR. ROMANO:

8    Q.   My question was if while Mr. Hessle was speaking to these

9    people if in whatever -- I'm sure he worked off a pitch or

10   something.  He said -- did you mention that they might get

11   money back?  That's all I'm asking.  Did they -- you said that

12   they were going to -- that they would ask a whole bunch of

13   other questions.  It opens up a door to a lot of questions and

14   at any time did you answer about whether they're going to get

15   back money?

16   A.   That question is asked especially in the restitution

17   phase in which they're told that restitution is something that

18   is completely out of my control.  My job is to handle

19   prosecutions and if restitution, if there is restitution at

20   the end of the rainbow that's a blessing.

21   Q.   Do you know whose job that is to handle that?

22   A.   Once the court decides that there's going to be

23   restitution then it comes back to me.

24   Q.   Meaning?

25   A.   Meaning that we have to come up with the restitution

1  formula in cases like this in which they're not so easily
2  defined.
3  Q.   And is that when you try to get these affidavits from the
4  people or do you get them beforehand?  In other words, do you
5  get the affidavits when you tell them you might have been
6  defrauded or do you get these affidavits after you tell them
7  we're in a restitution phase and you might be able to get
8  money back?
9  A.   Again, I said I don't send out the affidavits of
10  restitution.  The U.S. Attorney's Office does, the Office of
11  Victim Notification Services.  Whatever comes back then they
12  give them to me.
13  Q.   But in other words they're not going to send out --
14  they're not going to send out a notice to these people without
15  first conferring with you.  You're the head investigator of
16  this; am I correct?
17  A.   That's not the way this works.  In your particular case
18  in early 2009 a notification was sent from the U.S. Attorney's
19  Office to the 1,520 people that you victimized and in return
20  they were put on notice that you may be a potential victim,
21  give us a number where you can be contacted or an email
22  address or whatever it is and that sets the foundation for the
23  victim notification service.  And if they sign on then they're
24  notified as to core actions or sentencings or pleas or
25  whatever else.  They get to follow the case all along in the

1   event they want to testify as a victim in any of those

2   proceedings.

3       Once that's done like I said the notices are given to

4   them as to each phase of where the prosecution is going.  When

5   restitution becomes an issue then that -- those same people,

6   those 1,520 people are sent notices of affidavits.  If they

7   want to apply for possible restitution well, then fill this

8   out, tell us what you lost and in the event there is

9   restitution you may or may not become part of it.  That's the

10  way the system works.

11  Q.   Okay.  Good.  You answered my question.

12      What about putting together an inventory for you since

13  you just said -- what about that?  Were these people confused

14  putting together an inventory?

15  A.   An inventory of what?

16  Q.   An inventory of what coins they purchased.

17  A.   Keep in mind in many cases the people had sold their

18  coins.  In some cases the people couldn't even find their

19  coins because they were -- had reached that stage in life

20  where they just are very forgetful.

21      As far as inventories, I mean if people had it they sent

22  us documentation as to invoices and things of that nature.

23  Q.   Did you help them further that inventory?  In other

24  words, you testified that there were some cases where some

25  people had more coins than what you actually had invoices to

1  represent, did you help them if they didn't have --

2  A.    Did I tell them that they bought more coins than they're

3  accounting for, no.

4  Q.    Does that -- do these numbers reflect that or what you're

5  telling me or is this these numbers of the invoices?

6  A.    Those are the -- say that again.

7  Q.    In other words, the people filled out an affidavit and

8  for example they say I bought $20,000.00 in coins and they

9  hand you over $20,000.00 in invoices.  Will that person be

10 listed on here as purchasing $20,000.00 in coins or would you

11 add to that with invoices maybe that you found from this

12 database of my computer and say no, it's not 20,000, let me

13 remind you it's 30,000?

14 A.    In no case did we contact people to have them increase

15 the amount that they're claiming, no.

16 Q.    Okay.  Thank you.

17      So they put together this invoice, these invoices.  They

18 filled out an affidavit.  They were confused when they were

19 doing it you say.

20 A.    I can't account for every victim that was filling out

21 these affidavits to say that they were confused at the time.

22 I wasn't there.

23        THE COURT: Is it your position that everyone was

24 confused?  No.

25        THE WITNESS: No.

1              THE COURT: What's your position with regard --

2              THE WITNESS: My position is I had spoken with people

3    who were confused when confronted early on in the

4    investigation about the coins -- about the company that I was

5    referring to.

6    BY MR. ROMANO:

7    Q.    And you don't know how many were confused and how many

8    weren't?

9    A.    No.

10   Q.    Okay.  Let me switch gears here for a second, Mr. Hessle.

11   You know a little bit about coins; am I correct?

12   A.    A little bit, yes.

13   Q.    You're not an expert?

14   A.    Never.  Never claimed to be an expert.

15   Q.    You know certain terminology; right?

16   A.    I've learned more terminologies through this

17   investigation if that's what you mean, yes.

18   Q.    You know various coins, the correct denominations.  You

19   know what a Morgan dollar is?

20   A.    Sure.

21   Q.    You know what a Ben Franklin is?

22   A.    Yes.

23   Q.    Have you ever purchased a coin?

24   A.    Yes.

25   Q.    Can you tell me from who?

1           THE COURT: Not in your personal capacity.

2           MR. ROMANO: It's personal.

3           THE COURT: You don't need to answer the question.

4  What else do you want to ask?

5  BY MR. ROMANO:

6  Q.   How old are you, if you don't mind me asking, Mr. --

7  A.   62.

8  Q.   That was my guess.

9       Would you say you're vulnerable?

10          THE COURT: You don't need to answer the question.

11 Next.

12 Q.   If I were to sell you coins today, Mr. Hessle --

13          THE COURT: We're not going down the line of

14 hypotheticals.  What else?

15          MR. ROMANO:  If you'll just give me one moment,

16 please.

17                    [Pause in proceedings.]

18 BY MR. ROMANO:

19 Q.   Mr. Hessle, what I want to know is, and I think you've

20 answered the question, is there's no possible way of you to

21 know whether a person was vulnerable when they bought coins

22 ten years ago, nine years ago, five years ago; am I correct?

23 A.   That's correct.

24 Q.   And some of these people you've indicated they passed

25 away?

1  A.   Yes, they have.

2  Q.   Getting back to the coins and the terminology, you don't

3  know what things are like a DMPL; am I correct?

4       THE COURT: What's DMPL?

5       MR. ROMANO: A Deep Mirror Proof-Like.

6  Q.   You don't know those acronyms?

7  A.   I've seen the term.  I'm not -- I've never --

8  Q.   You don't know the characteristics of various coins and

9  areas where they wear?

10 A.   Like I said, I'm not an expert in coins, no.

11 Q.   So you basically started to learn about these coins, you

12 learned about these coins through this investigation?

13 A.   I learned about your coins from your investigation, yes.

14 Q.   When you say my coins, you mean -- I mean I don't

15 understand that.

16 A.   Your company's coins if that was the question, yes.

17 Q.   You learned about it through this investigation but coins

18 in general you're saying you knew about -- you know about

19 other coins?

20 A.   I knew of the existence of coins as a hobby.  Put it that

21 way.

22 Q.   Are you familiar with a gray sheet?

23 A.   Yes, I am.

24 Q.   Are you familiar with a blue sheet?

25 A.   Yes, I am.

1  Q.    A gray sheet is a dealer to dealer newsletter.  Is that

2  fair to say?

3  A.    Yes.

4  Q.    In other words, that shows pricing of what I pay for a

5  coin or what I sell for a coin dealer to dealer.

6  A.    Yes, that's my understanding.

7  Q.    So, in other words, these prices that I came up with or

8  my company came up with they don't -- do they reflect the gray

9  sheet's pricing?

10  A.    I don't understand the question.

11  Q.    In other words, you'd have numbers on here that reflect

12  the dollar amounts in invoices that people paid for coins.  Do

13  those numbers coincide with the gray sheet?

14  A.    I have no idea.

15  Q.    So after eight years of investigating, and it's been

16  roughly about that long, you've learned a little bit about

17  coins and there's a good possibility that you're still not an

18  expert as you say; right?

19  A.    Again, I'm not an expert in coins.

20  Q.    You're not.  And some of the people that you spoke with

21  on the phone, some of these -- some of my customers they have

22  been purchasing coins for 20 years, 30 years --

23  A.    I don't -- give me a particular -- I'll let you know if I

24  know --

25  Q.    I have a particular here of 222 people.  I mean I don't

 1  think you've got that committed to memory.  I mean do you --

 2  where is that sheet?

 3                    [Pause in proceedings.]

 4           MR. ROMANO: Can you give me one second?

 5                    [Pause in proceedings.]

 6  BY MR. ROMANO:

 7  Q.   I'm sorry about that, Mr. Hessle.

 8       Somebody like this No. 13, this Michael Bay, do you know

 9  how long he's been purchasing coins?

10  A.   I know how long he's been purchasing your coins.  From

11  December 2007 to September 2008.

12  Q.   Yes, that's not the question.  The question is do you

13  know how long he's been purchasing coins.

14  A.   I have no idea.

15  Q.   In most cases do you think that these people have

16  purchased coins for more -- longer than the existence of my

17  company?

18           MR. OTT: Objection.  Relevance.

19           THE COURT: Denied.  Do you know the answer?

20  A.   Repeat the question.

21  Q.   The question is do you think these people have been

22  purchasing coins since my company was started back in 2000 or

23  2001.  They've at least been purchasing coins for that long;

24  correct?

25  A.   Yes.

1           THE COURT: I'm sorry.  You think they have been

2    purchasing coins prior to 2004, most of the victims?

3           THE WITNESS: I know that they've been purchasing

4    coins for the time span that we have on this document.

5           THE COURT: I think the question is do you know that

6    they were -- do you know if any of them purchased coins

7    earlier than the dates that are on there.

8           THE WITNESS: Not off the top of my head.

9           THE COURT: Then the more general question is do you

10   know if they were purchasing coins in the marketplace in

11   general prior to the dates that are on this --

12          THE WITNESS: I have no idea, Your Honor.

13   BY MR. ROMANO:

14   Q.   Well, the reason I ask, Mr. Hessle, is because you've

15   said in the past that when you had to sort through coins and

16   things that there -- you had to make sure that other people's

17   coins weren't mine coins.

18   A.   That's correct.

19   Q.   So you know that they had bought coins from other people.

20   A.   That wasn't the question I don't think. Was that the

21   question?

22          THE COURT: No.  The last question was a timing

23   question.  Are you suggesting at some point these people

24   bought coins from other people, other businesses?

25          THE WITNESS:  Yes.

1  BY MR. ROMANO:

2  Q.   Well, Mr. Hessle, my company has not been in existence

3  forever and again we're only talking about from 2004 I believe

4  here.  So there has been coin companies that have been around

5  for a lot longer, 20 years, 30 years, 40 years.  My question

6  is do you know -- I'll rephrase it.

7     Do you know whether or not these people bought from other

8  people?

9  A.   Yes, they do -- well, in some cases definitely as

10 evidenced by the fact that some of the affidavits were

11 submitted with invoices from other companies which were

12 discounted from the chart.

13     THE COURT: Where is this going?  Let me ask.  How

14 much more time do you need, Mr. Romano?

15     MR. ROMANO: I'm thinking about a half hour.

16     THE COURT: Let me ask for the Marshals.  I need to

17 take another case for about ten minutes.  How would this go

18 with your schedule?  We're going to have this hearing for

19 about another half hour.  Do you want to run until lunch?  Do

20 you want to come back after lunch?  What's the schedule that

21 works?

22     MARSHAL: Lunch [inaudible] coming back.

23     THE COURT: Then it would run I guess until 1:15 or

24 1:30.  What is that -- or do you want to -- you tell me on

25 your schedule besides getting hungry.

1           MARSHAL: Preferably if Your Honor [inaudible].

2           THE COURT: We're going to take a ten minute break.

3    We're going to take a ten minute break.  Mr. Romano, think

4    about what your questions are for the next half hour.  Are you

5    standing up for comfort or do you want to say something?

6           MR. ROMANO: I thought we were being asked --

7           THE COURT: You are.  So, Agent Hessle, don't talk

8    about your testimony during the break.

9           THE WITNESS: Yes, Your Honor.

10          THE COURT: I'm just going to call the other case.

11   (Off the record at 11:33 a.m.)

12   (Back on the record at 12:09 p.m.)

13          THE COURT: We're back on the record.  So this is

14   United States v. Romano.  We have Agent Hessle on the witness

15   stand again.  I'm just reminding you you're under oath.  So,

16   Mr. Romano, do you want to continue your examination?

17          MR. ROMANO: Okay.

18   BY MR. ROMANO:

19   Q.   Mr. Hessle, I wanted to ask you about one of these

20   customers here and I'm working off memory but I noticed his

21   name here.  A Shephard Wilmack [Ph.].  Are you familiar with

22   him?

23   A.   Wilomack?

24   Q.   Yes.

25   A.   Yes.

1   Q.   He's purchased -- well, the determination is $219,000.00

2   in coins.  Would you say that this man is infirm or confused?

3   Would you group him in that group of people that you say

4   are -- they don't know what's going on, that they're confused?

5   Would you group them with those people?

6   A.   No.

7   Q.   Why is that, Mr. Hessle?

8   A.   I've spoken with Mr. Wilomack many times over the --

9   during the course of the investigation.  I didn't find him to

10  be confused at all.

11  Q.   In fact, did you use Mr. Wilomack to tape some of my

12  salesmen and do an investigation of his own?

13  A.   Mr. Wilomack took it upon himself to tape the

14  conversations with the salesmen from your companies.

15  Q.   Are there any other people who have taken it upon

16  themselves to do such a thing?

17  A.   There were a number of them, yes.

18  Q.   There were.  And they handed that over to you, the tapes?

19  A.   Yes.  It was all turned over in discovery.

20  Q.   What did you find from those tapes?

21  A.   I found salesmen making misrepresentations to the victims

22  or the potential victims at the time about the value of their

23  coins and how many hundreds of thousands of dollars they've

24  gone up in the past month and how the investor has told them

25  that they want some additional coins purchased but when they

1  purchased the additional coins that the victim will receive X

2  amount of more dollars for the collected set that they've

3  assembled.

4  Q.   And Mr. Wilomack believed that?

5  A.   Yes, I believe he did.

6  Q.   Then he taped the person who spoke like that; is that

7  right?

8  A.   Mr. Wilomack as far as -- as best I can recall had been

9  not at my request but he had been recording these people for a

10 while.

11 Q.   Do you know the name of the person that he recorded?

12 A.   I think, and this is sort of fuzzy, but I think it was

13 Arnold.  I think it was your brother Sal.  I think it was Tony

14 Lanza.

15 Q.   Maybe Steve Candemeres as well?

16 A.   It's certainly possible.

17 Q.   Because I listened to those tapes and I just -- I'm

18 wondering if you could tell me if you heard the same things I

19 have which is they were -- I want to word this right.  They

20 spoke to a salesman and the salesman was pitching them coins

21 and they stayed on the phone with them for a very long time

22 and Mr. Wilomack and there's another gentleman, I can't

23 remember his name, but they were sort of trying to get the

24 salesman desperate into saying things.  They were alluding to

25 the fact that they might buy.  Did you hear that?

1           THE COURT: What's the relevance?

2           MR. ROMANO: The relevance is that I believe that

3    these people that Mr. Hessle says that are confused are not

4    confused.  They're people who bought a lot of money in coins

5    and they're people who helped him in an investigation and so

6    not even being confused these people are some feisty people

7    that we're talking about.  We're not talking about somebody

8    that's infirm.

9           THE COURT: Where does the argument go?  Because on

10   the one hand to the extent that there's a need for restitution

11   because of the vulnerable, confused, et cetera nature of the

12   victim/purchasers, the state of mind may be relevant although

13   you've already asked if the state of mind is a purchase is

14   known to Mr. Hessle, Agent Hessle, which he said no, and to

15   the extent these are people with exceptional acuity about the

16   state and -- of the market for coins doesn't that support

17   their affidavits?  Doesn't that mean that they know that they

18   bought coins, that they understood what was going on and that

19   they are accurately reporting what happened to them and

20   flipping through this there are many passionate statements

21   about what happened to them?  So I don't understand where this

22   goes.

23          MR. ROMANO: Well, did I establish that because

24   that's what I'm trying to do is establish that these people

25   are in full control of their senses and they bought from a

1   salesman on the telephone.

2          THE COURT: But you've already pled guilty so we're

3   talking about the restitution.  The only issue that's going on

4   here is how much -- should there be restitution and if so, how

5   much, and Agent Hessle is on the stand because he's the person

6   who is the way in which -- the Government has introduced

7   evidence that goes to what credit if any -- what are the

8   claimed damages and how should that be calculated and in part

9   because the Government has made an effort to make sure that

10  there's some consistency in the relationship between the value

11  of the coins and the sales price.

12         So establishing that these people are in their full

13  right minds and know what they're talking about to the extent

14  you're trying to say that you shouldn't have to pay

15  restitution or you shouldn't have to pay as much restitution I

16  don't see how it helps your case.  So I'm not clear why we're

17  spending time on it.

18         MR. ROMANO: Well, Your Honor, first I just want to

19  say that I have filed a motion to try and set my plea aside.

20         THE COURT: Right.  But there's no restitution if

21  your plea is set aside.  That's for the district judge and we

22  went through this the last time.  If there's motions -- if

23  your motion is granted this whole thing will take a different

24  course but we're doing this on the assumption that that's not

25  being granted so that we don't end up very far behind if it's

1    denied and to get a full record in this case.

2              So we're not --

3              MR. ROMANO: Please bear with me because I'm trying

4    to -- I'm trying to ask certain questions that I'm not being

5    allowed to ask here and the truth of the matter is, is we're

6    trying to put a valuation on non existent coins.  We're

7    talking about something that don't exist.  Mr. Hessle has said

8    we have four people with coins.  I think I'm pretty generous

9    in saying well, you have these four people's coins, whether

10   they bought it in 2003, 2002 or whenever they bought the coins

11   hey, if they're not what they're supposed to be and you could

12   establish that those are in fact my coins which I don't even

13   know how somebody would do something of such, well then I

14   would -- I'm willing to accept that but we're talking about --

15   we're talking about somebody who put together -- the

16   Government put together a whole bunch of paperwork here and

17   I'm supposed to establish a value based on what this paperwork

18   says.  This paperwork means nothing.  We're not talking about

19   something that's consumable.  We're not talking about

20   something that's perishable.  We're talking about a coin.

21   Where are the coins?

22             THE COURT: All right.

23             MR. ROMANO: We didn't bring them here.  We didn't

24   bring the people here.  Nobody testifies.  Nobody comes in and

25   we just have the testimony of Mr. Hessle which I think, I

1    think that I should be given a little -- just a little bit of

2    consideration considering this is my only witness.

3              THE COURT: So let's focus on a cross-examination but

4    this line of questioning as to the mental state of the

5    affiants for which Mr. Hessle or Agent Hessle has stated that

6    he has limited knowledge about their particular state of mind,

7    any particular point except to the extent that he had

8    particular conversations and happens to remember the people

9    and he doesn't have any knowledge about their state of mind,

10   at least contemporaneous knowledge about their state of mind

11   when they made the purchases.

12             So if there's anything else to be said about that

13   let's wrap it up and move on to whatever else your challenge

14   is to Agent Hessle's testimony.

15             MR. ROMANO: Okay.

16   BY MR. ROMANO:

17   Q.   Mr. Hessle, I have invoices of wholesalers in front of

18   me.  Can you explain to me what this is?

19             THE COURT: Let's talk about a particular document

20   number so we know what you're talking about.

21             MR. SERCARZ:  Your Honor, for the record, Joseph

22   Romano is referring to REST or Restitution 00325 through 005-

23   0512.

24             THE COURT: 325, that was the first number? Is that

25   right?  325.

1          MR. SERCARZ: 325 through 512.

2          THE COURT: Thank you.

3          MR. SERCARZ:  In the black binder.

4          THE COURT: So, Agent Hessle, do you see those

5    documents there on the binder?

6          THE WITNESS: Yes, Your Honor.

7          THE COURT: All right.  What's your question, Mr.

8    Romano?

9    BY MR. ROMANO:

10   Q.   Mr. Hessle, can you tell me what that -- can you tell me

11   about this, these invoices?

12   A.   During the course of the investigation one of the avenues

13   we went down was to look at the records or the available

14   records of the wholesalers that supply the -- Mr. Romano's

15   companies with the product he was selling and it was done with

16   the intention of this:  All the coins, the initial coins that

17   were sold by Mr. Romano's three companies sold Benjamin

18   Franklin half dollars at MS64 plus.

19         THE WITNESS:  That's a grade, Your Honor, of MS64

20   plus.

21   A.   So we contacted the wholesalers who supplied these coins

22   to his three companies as well as the wholesalers themselves

23   to determine if in fact there had even been a roll of MS64

24   plus coins ever sold to any of the Romano companies and the

25   testimony of the wholesalers and the records support that a

1  roll of MS64 coins was never purchased.

2  Q.    So what this shows is that we bought a bunch of Benjamin

3  Franklin rolls, most of it is Benjamin Franklin rolls.  Now,

4  I've heard -- I've read the testimony in my brother's case.

5  Can you please tell me -- can you tell me what a BU roll is?

6  A.    A brilliant roll of a Benjamin Franklin half dollars as

7  defined at your brother's trial said that it's a roll of

8  perhaps mixed dates from 1960 to 1964 grading anywhere from an

9  MS60 to an MS65.  It's a mixed roll.

10  A.    So when you say a mixed roll, and this is the part I'm

11  having trouble with, you're saying that this is a roll that

12  somebody went through and put 62s, 63s, 64s and 65s and I

13  believe, I believe in the testimony Your Honor said in order

14  to get a 64 you would be super lucky if I'm correct.

15      What are you saying a mixed roll?  I don't understand

16  your terminology.

17  A.    In -- as it was explained at the trial, first of all

18  Benjamin Franklin half dollars for the most part are not

19  investable coins, not investable grade coins until you get to

20  a higher grade being 65 or 66 or whatever it might have been,

21  and as the suppliers testified at your brother's hearing, at

22  your brother's trial when you buy BU rolls of a date of coins

23  it's not limited to a roll of one grade.  It's subjected to

24  the fact that it could be a roll of 20 coins that has five

25  different grades and I think it was also brought up that the

 1  likelihood of getting an MS64 coin in a roll of BU was not

 2  likely.

 3  Q.    And this is where I'm having trouble.  How does a person

 4  do that?  How do you tell what's in a roll unless you opened

 5  it up and sent each piece out to get graded?  I don't

 6  understand that because I've been in the business for a long

 7  time, Mr. Hessle, and I know about what -- the way you buy Ben

 8  Franklin rolls.  It's a brilliant uncirculated roll and the

 9  truth is the only thing you know about their role is they're

10  brilliant uncirculated.  This was -- this is a name that was

11  given to these long before this grading system -- people

12  started making money with half grades and different grades.

13        So how do you come up with what the likelihood is of

14  that?

15  A.    Because if you're going to sell MS64 plus BU rolls --

16            MR. SERCARZ: Your Honor, I apologize but I'm going

17  to object on behalf of the defendant Vincent Romano.  I'm

18  concerned -- I understand that Joseph Romano is entitled to a

19  great deal of latitude because he's representing himself here

20  but I'm concerned that Agent Hessle is being asked questions

21  which -- the answers to which entail hearsay expert opinions

22  which Agent Hessle is forthright we indicated that he's not

23  prepared to give and not qualified to give and I don't think

24  that this is relevant to the methodology employed by the

25  experts or whether restitution can or should be applied in

1  this case.  So on behalf of Vincent Romano I'm going to note

2  my objection.

3          THE COURT: What's the Government's position?

4          MR. OTT: That it's irrelevant as well.

5          THE COURT: Why don't you answer the question and

6  again if you can.  If you can't you can't and then Mr. Romano,

7  it needs to be a focused examination.  I don't even know where

8  we left off with the question.  Since we don't have a reporter

9  we can't do a read back.  What did you want to say?

10          THE WITNESS:  I can only say, Your Honor, that if

11  you sell a product that's supposed to be a MS64 plus which is

12  a premium grade coin if you've never purchased a roll that you

13  can sell that way then clearly that's a fraud.

14          THE COURT: All right.  Again, this is about

15  restitution.  So this examination needs to focus on that.

16  There's already been guilty pleas in this case.  What's your

17  next question, Mr. Romano?

18  BY MR. ROMANO:

19  Q.   My question is on these invoices that are from the

20  National Coin Distributor and all this, is my signature on any

21  of these by any chance do you know?

22  A.   I see the name of your company is on there.  I don't see

23  any signatures.

24  Q.   The name of my company?  I'm sorry.

25  A.   American Coin Company.

1  Q.   Right.  If you look at Restitution 00397, do you see

2  that?

3  A.   Yes.  Yes, I see that.

4  Q.   Do you see my name anywhere on the sheet?

5  A.   It looks like a signature Joseph Romano, yes.

6  Q.   You say that's my signature?

7  A.   It says it's a signature and it says Joseph Romano as

8  best as I can decipher.

9  Q.   What about 399?

10 A.   It's the same thing.

11 Q.   Okay.  That's in -- on invoice 1229 of 2003?

12 A.   Yes, that's correct.

13 Q.   All right.  The reason I ask that, Mr. Hessle, is because

14 that happens not to be my signature that are there.

15           THE COURT: We don't need testimony.

16           MR. ROMANO: I just wanted to know if you knew that.

17 Q.   You also have invoices of Island Collectible Coins?

18 A.   Yes.

19 Q.   00324?

20 A.   Yes.

21 Q.   And you don't see my name on those either, do you?

22 A.   Your name is not -- the name Joseph Romano is not on

23 there, no.  Just your company.

24 Q.   Right.  Not my signature though?

25 A.   No.

1  Q.   Okay.  Getting back to these people they've been

2  collecting coins --

3         THE COURT: Who are we talking about, the affiants

4  for the loss victim's loss affidavit?

5         MR. ROMANO: Yes.

6  Q.   These people have been collecting coins for a very long

7  time, Mr. Hessle.

8  A.   I can't say that these people have been collecting coins

9  for a very long time.  I know in conversation with some of

10 them that they had been collecting coins but I can't make a

11 statement that they've all been collecting coins for a long

12 time.

13 Q.   Mr. Hessle, when you call these people up on the phone

14 and you start asking them for affidavits, some of these people

15 we've established they know more about coins than you do.  Am

16 I correct in saying that?

17        THE COURT: Sustained.  That's not what the testimony

18 was entirely and it's unnecessary.  So what's the question?

19 Q.   Coins people spend -- some of these people have spent

20 thousands and thousands of dollars in coins.

21 A.   Millions.

22 Q.   Millions in coins.  And if you take into consideration

23 money as a form of a standing these people are less vulnerable

24 than you or I, am I correct in saying that?

25        THE COURT: Sustained.  You don't have to answer the

1   question.

2   BY MR. ROMERO:

3   Q.   Did these people tell you why they were collecting coins,

4   Mr. Hessle?

5            MR. OTT: Objection.

6            THE COURT: Denied.

7   A.   People I've spoken with over the years as I recall often

8   told me that they were collecting coins because the people

9   that were selling the coins told them that this would be a

10  good investment for their grandchildren and that they should

11  take them and stuff them into a closet and then when they're

12  all done with this collection they'll have all this money for

13  their grandchildren or for their children and things of that

14  nature.

15       There were a few people that said that they collected

16  coins because they liked to.

17  Q.   Did some of these people think that they were going to

18  use this as an avenue of investment?

19  A.   They were led by the salesmen to believe that this is an

20  investment and that their investment was skyrocketing at a

21  rate beyond normal returns.

22  Q.   And so --

23           MR. SERCARZ:  Your Honor, I'm going to move to

24  strike.  I know that the rules of evidence are not fully

25  applicable at this kind of a hearing but the answer contains

1   hearsay and I'm going to object --

2           THE COURT: Denied.

3           MR. SERCARZ:  -- on behalf of Vincent Romano.

4           THE COURT: Denied.

5           MR. TOMAO: Objection on behalf of Kevin Wells.

6           THE COURT: Okay.  All right.  Denied.  That's the

7   question.  It's elicited for the purposes of Mr. Romano's

8   cross-examination of Agent Hessle.  That's the kind of answer

9   that comes to that kind of a question.  So what else?

10          Again, I remind you, Mr. Romano, this is a hearing

11  about restitution.  Agent Hessle appears as the Government's

12  witness to -- he's authenticated what's been introduced, going

13  through the details of these affidavits that were provided,

14  documents were provided.  There's also some background

15  material for other hearings and he's here -- the focus of this

16  hearing and the challenge is the value that should be assigned

17  any -- the values that should be used in any calculation of

18  the amount of restitution to the extent that there should be

19  restitution ordered.

20          MR. ROMANO: And I completely understand that, Your

21  Honor.

22          THE COURT: Just focus your questions in a way that

23  gets to your view of how that should be done.

24          MR. ROMANO: The problem I have is that this Court is

25  asking me to talk about something that doesn't exist.  We

1   don't have coins.  We don't know what the handling of the

2   coins were.

3           THE COURT: So that's one objection.  Your view is we

4   shouldn't have restitution because we don't have the physical

5   coins.  Every single coin that was purchased that's being

6   charged to you as a basis for the restitution is not here in

7   court or hasn't been examined by an expert and you're opposed

8   to this what I'm going to call sampling method.  I get the

9   objection.

10          But what is it that Agent Hessle can contribute?

11  Because we have a briefing schedule.  He's here to -- he

12  provided the evidence that he provided.  You're permitted to

13  cross-examine him.  You're also permitted to make your

14  submission and opposition to the Government's motion.  We've

15  already talked that schedule.  So I don't need to hear the

16  arguments here through your cross-examination of Agent Hessle.

17  What you need to do is elicit whatever evidence or response

18  that you need to the questions that you want to use in your

19  opposition.

20          MR. ROMANO: Your Honor, I --

21          THE COURT: So let's just ask the questions.  Let's

22  go.

23  BY MR. ROMANO:

24  Q.   So in some instances, Mr. Hessle, people were looking to

25  make an exuberant amount of money with their hobby.

1          THE COURT: Exorbitant?

2          MR. ROMANO: Exorbitance, I'm sorry.

3    A.   I think they were led to believe that by purchasing these

4    coins they were going to make an exorbitant amount of money,

5    yes.

6    Q.   And, you know, you've said that people spent millions on

7    coins; correct?

8    A.   Yes.

9    Q.   Did they just write a check for a million dollars?

10   A.   No, because the way the scheme worked it's that in order

11   to keep the victim in tow you had to continually tell them

12   that they needed to complete the set, a roll set of Benjamin

13   Franklin half dollars, and that this investor when you

14   finished completing this set, this investor was going to buy

15   them back from you as in your own words as exorbitant amount

16   of money but what happens is once the person -- one person

17   comes to mind.  Once the person reaches the plateau of having

18   finished that roll set and the investor -- and obviously the

19   investor isn't going to buy them, they say well, fine, the

20   investor's died but we have a new investor and this new

21   investor wants you to purchase this additional set and now --

22   and the victim now is at a point of no return because he can't

23   turn around and sell the coins back.  He has to keep going

24   hoping that this is legitimate until it gets to the point

25   where -- it gets to $2.2 million or whatever it was.

1  Q.   So, in other words, a person buys a coin or a roll of

2  coins and they're told they have to finish a set and they chip

3  away at building a set and you're saying to me that the

4  salesmen says that once this set is completed they're going to

5  be able to turn around and sell this set for 50 percent, 100

6  percent, 400 percent more than what they paid?  Is that --

7  A.   They have an investor that's going to -- this is called

8  the investor pitch, remember that?  That's what happens is

9  that when you get to the point --

10      MR. OTT:  Your Honor, I object to the line of

11  questioning.  Maybe we can have a new question and refocus

12  this.

13      THE COURT: Yes.  You don't have to answer that

14  question.  Next question, Mr. Romano.  I mean we're getting --

15  you're going to be cut off if you don't focus this because

16  we're not litigating the underlying merits of the case.  There

17  was a guilty plea.  This is a question about restitution and

18  while it may touch or be connected to the underlying merits

19  we're not revisiting them.

20      So let's go.  Agent Hessle as I've already said is a

21  source of limited information in this case.  Your cross-

22  examination should be tied to the issues that relate to

23  restitution.

24  BY MR. ROMERO:

25  Q.   Mr. Hessle, is this a -- is selling coins, is this is a

1  federally controlled business?

2  A.    No, it's not.

3  Q.    Do you need a license?

4  A.    No.

5  Q.    In other words, anybody could set up and sell coins?

6  A.    Certainly.

7  Q.    Now, you've said something about an investor pitch and I

8  only have one question about this.  When somebody calls

9  somebody up on the phone to start off getting them to buy

10 coins these people are people who have bought coins previous.

11         MR. OTT: Objection.

12         THE COURT: Sustained.  He's already answered the

13 question about what he knows about the previous purchasing of

14 coins by the affiants of the victim loss statements.

15 Q.    Well, you -- where do we get our names from to call these

16 people?

17         MR. OTT: Objection.

18 A.    I'm sorry?

19 Q.    The names to call these people.

20         THE COURT: Sustained.  It's not relevant.

21 Q.    Getting back to the coins themselves.  You have a

22 methodology sheet here.  You have four people out of 220

23 people.  If in fact, and if I'm reading this right you're

24 going to try and put a value, you're saying that everything

25 that I've sold in an eight-year period is based, those numbers

1   are based on these four people here that you yourself said

2   that you don't know how the coins got to Gary Atkins or John

3   Albanese or whoever.  That's how you're going to value it.

4       THE COURT: That's an argument about the merits of

5   the Government's position that the defendants should be

6   credited with basically retained value of 24 percent.  It's

7   not Agent Hessle's position to argue what the Government's

8   view as to how restitution should be calculated.  If you want

9   to ask him about how that number for example could apply to

10  all of the other purchases or something along that line of

11  questioning go ahead.

12      MR. ROMANO: Your Honor, I'm being prevented from

13  asking the appropriate questions here and it all goes --

14      THE COURT: Mr. Romano, you were allowed to ask

15  Agent -- I'm not arguing with you.  I'm telling you what

16  you're allowed to do.  You can ask him substantive questions

17  about the evidence that he's able to offer and contribute to

18  the case.  If you want to have an argument about the merits of

19  the Government's position with regard to the -- whether it

20  should or shouldn't be calculated in a particular way you can

21  do that in writing in your opposition papers.

22      Ask Agent Hessle the cross-examination questions

23  that you would like to -- that would elicit information,

24  factual information that would be helpful for your opposition.

25      MR. ROMANO: You're talking about factual and we

1  don't even have coins here.

2          THE COURT: We've already -- we've got that argument.

3          MR. ROMANO: I'm finished with my questioning.  Thank

4  you.

5          THE COURT: Do you have any other questions you'd

6  like to ask Agent Hessle?

7          MR. ROMANO: No.  Nope.

8          THE COURT: All right.  Let me just ask one thing.

9  There is in this binder an affidavit in -- how do you say his

10  name, the Nesees case?

11          MR. SERCARZ: Robert Nesees.

12          THE COURT: That was written by Albanese.  Is that

13  right?  Do you have any other information about that or does

14  that -- to the extent if at all you know that that -- what's

15  said in that affidavit which appears to have been submitted in

16  the state court describes Mr. Albanese's approach to

17  evaluating coins.  Do you know?  I'm sorry.  It's Restitution

18  05 from the black binder.

19          MR. SERCARZ:  Yes, I see it.

20          THE COURT: Because this is -- is this the basis --

21  A, the first question I ask is sort of a broad one, if this is

22  Mr. -- do you have any knowledge about this being Mr.

23  Albanese's approach to evaluating coins and then two, does

24  this affidavit explain his methodology that was particularly

25  used for Mr. -- I'm sorry, say it again, Nesees, as he's

1  listed on B which is the short chart that we looked at

2  earlier.

3          MR. SERCARZ: Is that the same Albanese, yes, Your

4  Honor.

5          THE COURT: If you look at the numbers that are in

6  this affidavit which appears to have been submitted in a state

7  court action in Nassau County about Mr. Nesees versus Joseph

8  Romano, American Coin Company, Last Quarter Coin, Inc. and it

9  was the index numbers 18183/2006.  Am I right that these are

10  the -- is this the same evaluation that is the basis -- let me

11  ask.  Is the evaluation discussed in this affidavit the same

12  evaluation that you're reporting on your description of the

13  determining the value of victim's coins chart which was B?

14          MR. SERCARZ: No.  The chart that you have, Your

15  Honor, is from 2012.  I think the one that's referenced in Mr.

16  Albanese's affidavit was the earlier.

17          THE COURT: But just -- is it looking at the same

18  coins or different coins?

19          MR. SERCARZ: It's the same coins.

20          THE COURT: Okay.  So if we had had -- there was the

21  early -- the initial evaluation and then the increase in price

22  because of the increase in the value of silver.  This

23  affidavit describes the Government's initial -- what the

24  Government initially used as the evaluation for the value of

25  the coins.

1      MR. SERCARZ: The same coins, yes, Your Honor.

2      THE COURT: We're looking at the same coins, okay.

3  So the statement -- let's see.  This is at the end of that

4  affidavit.  It says the $532,000.00 coins.  That's the same

5  532 that's on here; is that right?

6      MR. SERCARZ: Yes, Your Honor.

7      THE COURT: Do you have any information -- there's a

8  brief description of the evaluation process for looking at the

9  coins in this affidavit.  Do you have any information as to

10  whether what's described in this affidavit is the same as what

11  Mr. Albanese did when he did the reassessment I guess we'll

12  call it, the second evaluation that accounted for the increase

13  in the price of silver?

14      MR. SERCARZ: There's been no change.  I haven't

15  spoken with Mr. Albanese other than to ask him to do the

16  update based upon the increase but I don't know if his methods

17  of valuating have changed.  I doubt that they have.  He

18  probably used the same sources.

19      THE COURT: I think this is already clear but let's

20  just make it a hundred percent clear.  The Government's

21  original evaluation that come up with whatever, the 16 point

22  something number overall as to Mr. Nesees that would be

23  described in this affidavit; right?

24      MR. SERCARZ: Yes, ma'am.

25      THE COURT: Just by chance as to Ms. Black, do you

1  know if the same process was applied?

2       MR. SERCARZ: No, ma'am.  The way that scenario

3  played out is if I asked John to, John Albanese to look at the

4  Ben Franklin half dollars that Ms. Black had.  Subsequent to

5  that he told me of Nesees.  That's how Nesees comes into play

6  here.

7       THE COURT: But just the process that's generally

8  described -- I'm just going to pick a paragraph here.  He

9  generally describes Paragraph 13, grade of clients, determined

10 on the basis physical condition, reflects the amount of wear,

11 there's a grading scale zero to seventy, and he describes

12 looking at the coins and making his evaluation.  Do you have

13 any information about the process?

14      MR. SERCARZ: The only thing I could say, Your Honor,

15 I wasn't there for his examination or grading of Nesees'

16 coins.  I was there for the grading and evaluation of Ms.

17 Black's and he used the same type of formula but I can't --

18 whether he used it the same thing in 2012 when we requested to

19 update I couldn't tell you.

20      THE COURT: All right.  Does anyone have any other

21 questions they want to ask of the witness?

22      MR. SERCARZ: Your Honor, I don't know whether the

23 record is clear as to -- Mr. Ott can tell me if this has been

24 taken care of.  The Government indicated that there are three

25 categories of victims here, those that retained all their

1   coins, those that sold some and those that sold all.  I don't

2   know that the record is clear in this case as to how credit

3   was applied in the event that some or all of the coins were

4   sold.  If I'm right about that there's a gap in the record

5   that ought to be taken care of.

6           MR. OTT: Just to close the loop, if you permit me,

7   Your Honor, I'll just elicit the testimony the testimony from

8   Mr. Hessle now as to these three classes.

9           THE COURT: Yes, why don't you do that.

10                       REDIRECT EXAMINATION

11  BY MR. OTT:

12  Q.   Mr. Hessle, do you recall that we broke down the types of

13  victims into three classes?  Can you please explain for us how

14  those classes were incorporated into Exhibit A?

15          THE WITNESS:  Your Honor, can I refer to my notes on

16  this?

17          THE COURT: Yes.

18  A.   The methodology used to determine that was identical to

19  Michael Romano's.  In this particular case the number of

20  affiants that we had obviously were 226.  The number of

21  affiants that sold none of their coins, none of their coins

22  was 194.  That's 86 percent of the affiants.

23       Five -- in addition to the 194, five had sold some of

24  their coins and finally there were 27 or 12 percent that had

25  sold all their coins.  Now, in devising the amount for those

that had sold some of their coins the revenue or the money

that was realized from the sale of the coins that they sold

was deducted from the amount they had purchased and from that

number, the remaining number 24 percent was applied.

Q.    Then on the ones in either end, which to say the ones who

sold all of them or sold none of them, if you could just

describe for the record what was done.

A.    Well, in the case in which none of the coins were sold

that was a little easier because all you had to do was apply

the 24 percent across the board.  In the instance where the

person had sold or the victim had sold all of his or her coins

the actual amount that was received was used to determine the

loss.

        MR. SERCARZ:  If I may ask a follow up question,

Your Honor, just to make it clear in my own mind.

        THE COURT: Yes.

                        RECROSS EXAMINATION

BY MR. SERCARZ:

Q.    In other words, you're deducting for the amount they --

that victims received by selling the coins against the

purchase price?

A.    That's correct.

Q.    And then you are applying the 24 percent?

A.    That's correct.

Q.    So if, for example, a victim sold coins to a dealer for

1  only ten percent of the purchase price and that amount gets

2  deducted from the purchase price and the 24 percent ratio gets

3  applied to the remainder?

4  A.   Yes, that sounds right.

5           THE COURT: Is there somewhere in the record without

6  reading -- hang on -- every affidavit, is there a grouping of

7  who falls into which category?

8           MR. SERCARZ: You mean how to organize the affidavits

9  that have been provided?

10          THE COURT: Yes.

11          MR. SERCARZ: No, I don't believe that's --

12          THE WITNESS:  I'm sorry, Your Honor.  What was the

13  question?

14          THE COURT: If there was anywhere in the record that

15  it made clear without reading each affidavit individually who

16  fell into which category.

17          THE WITNESS: No, ma'am.

18          MR. OTT:  Can we just have a moment, Your Honor?

19          THE COURT: Sure.

20                   [Pause in proceedings.]

21          THE COURT: All right.  Yes.

22          MR. SERCARZ:  If I may, Your Honor.

23          THE COURT: Yes.

24          MR. SERCARZ: Real quickly.

25  BY MR. SERCARZ:

1  Q.   I'd like to show you and I just for purposes of

2  explaining to the Court, an instance where perhaps

3  inadvertently the subtraction was not made, if I can approach

4  and I'm going to show you the victim loss summary as to Steven

5  Babcock, Customer No. 6 and the victim affidavit as to

6  Babcock.

7          MR. SERCARZ: May I approach and use the microphone

8  by the witness?

9          THE COURT: Yes.

10 BY MR. SERCARZ:

11 Q.   Agent Hessle, am I correct that in --

12         THE COURT: Hang on.

13 Q.   Am I correct that in Mr. Babcock's loss affidavit he

14 indicates that his loss is 200,000 and you can look right up

15 here at his affidavit if you wish.  It's REST-823.

16 A.   Yes.

17 Q.   Do you see that?  Okay.  And he indicates later on in the

18 affidavit that he needed to sell coins to raise the money that

19 the coins could only be sold at bouillon value and that he

20 received $30,000.00 of his initial investment back.  Do you

21 see that?

22 A.   Then it says "The net loss is around $200,000.00."

23 Q.   Around 200,000.  Okay.  Yet in the affidavit the

24 determined loss is based upon a $200,000.00 total purchase

25 price; is that correct?

1  A.   Or it could be based upon the fact that he lost

2  $200,000.00.

3  Q.   You're uncertain as to exactly how the calculation was

4  done in this case; am I correct?

5  A.   Bear with me one second, Your Honor.

6                    [Pause in proceedings.]

7            THE WITNESS: Can I proceed, Your Honor?

8            MR. SERCARZ:  I'm going to withdraw the whole line

9  of questions, Your Honor, because the affidavit indicates at

10 Page 2 that the total investment was $235,000.00 and that he

11 sold about -- he got about 30,000 from the sale and I think

12 that's how he calculated the 200. I don't want to mislead the

13 Court or the witness.

14           THE WITNESS:  Just for the record, Your Honor --

15           THE COURT: Why don't you explain the methodology and

16 what you're talking about, Mr. Sercarz, is what's on REST-824;

17 is that right?

18           MR. SERCARZ: Right.

19           THE WITNESS: I saw what Mr. Sercarz is referencing

20 here.  The records indicate that Mr. Babcock purchased

21 $259,960.00 from the company.  He claimed that he had

22 purchased 235 and that his loss was 200,000.  So I took his

23 loss number at 200,000.

24           MR. SERCARZ: I got it.  Thank you.

25           MR. TOMAO:  If I may, Your Honor, I just have one or

1   two follow up questions.

2            THE COURT: Yes.

3                      RECROSS EXAMINATION

4   BY MR. TOMAO:

5   Q.    So -- Inspector Hessle, you're saying that there are

6   different -- this chart that you prepared is not always based

7   on that mathematical application of the weighted average to

8   price to the purchase amount.

9   A.    I don't understand.

10  Q.    In other words, this -- in this case for Mr. Babcock you

11  relied upon his affidavit rather than some sort of

12  calculation?

13  A.    Yes.  I could have attributed the loss based upon the

14  amount of purchasing that he had done but as I stated earlier

15  I wasn't going to offer that he had purchased more.  If his

16  loss -- if he says he lost this amount and it's in an

17  affidavit I'm going to challenge it only if it seems to be

18  completely in left field.  That wasn't the case here.

19           THE COURT: I think it's slightly -- is that your

20  question?

21           MR. TOMAO: Yes, Your Honor.

22  Q.    I want to direct your attention to one other entry on

23  that.  Do you have both A and B in front of you?

24  A.    Yes.

25  Q.    So on B which is the victim's -- determining the value of

1  victim's coins for Lorne Kramer you have entries and then on

2  Page 4 of 9 of Exhibit A you have an entry for Lorne Kramer.

3  Do you have both of those in front of you?

4  A.   Yes.  Kramer, okay.

5  Q.   That's --

6           THE COURT: 107.

7           MR. SERCARZ:  No. 107, thank you, Your Honor.

8  Q.   On -- can you -- on Exhibit A you indicate that the

9  determined loss at 24 percent was $348,380.00; is that

10 correct?

11 A.   That's correct.

12 Q.   But on Exhibit B you indicate that the purchase price was

13 $280,355.00.

14 A.   That's for the 342 coins that were submitted to NGC.

15 That wasn't his total price, his total cost.

16 Q.   So the -- what's on B is just the amount of coins that

17 you came up with for those four witnesses?

18 A.   The --

19 Q.   Four affiants.

20 A.   In Government Exhibit B the amount of purchase price of

21 280,000 for Lorne Kramer represented the 342 coins that were

22 associated with that price that were submitted to NGC in

23 Florida.

24 Q.   But you're indicating there were additional coins that

25 were not submitted?

1  A.   Yes.

2  Q.   All right.  Thank you.

3           MR. TOMAO: Thank you, Your Honor.

4           THE COURT: Anybody -- from the defense, any other

5  questions for the witness?  Mr. Romano?

6           MR. ROMANO: No, Your Honor.  Thank you.

7           THE COURT: All right.  For the Government?

8           MR. OTT: No, Your Honor.

9           THE COURT: Okay.  So we have all the paperwork that

10  we need, everything?

11           MR. OTT: Yes.  If it would be helpful we can submit

12  something grouping the affidavits in the way you're

13  suggesting.

14           THE COURT: I think it would be helpful just resort

15  your chart.  I don't need to do anything here.  Give us the

16  affidavits again or anything but just if you can tell us to

17  which categories.

18           MR. OTT: The subheaders, et cetera.

19           THE COURT: That would be helpful.

20           MR. SERCARZ:  Your Honor, you've given us a briefing

21  schedule and I'm going to request a little latitude.  I have a

22  vacation scheduled and I'm due to come back -- I'm leaving

23  Thursday and I'm due to come back the day before my submission

24  is due.  I would ask the Court --

25           THE COURT: You don't want to do it on vacation?

1          MR. SERCARZ: Pardon?

2          THE COURT: You don't want to do it on vacation?

3          MR. SERCARZ: No.  If I'm allowed to avoid that

4 headache I'd be grateful.

5          THE COURT: All right.

6          MR. SERCARZ: If I could get another week or two and

7 of course the Government can be given a commensurate amount of

8 time to respond I'd be grateful.

9          MR. TOMAO:  Your Honor, I was going to ask for the

10 two week extension.  I'd like to order this transcript and

11 send it to Mr. Wells and get his comments back.  So I think

12 it's going to take about four weeks to accomplish that.

13          THE COURT: What's the Government's view?

14          MR. OTT: We have no objection to the extension, Your

15 Honor.

16          THE COURT: So what dates do you want?  Let's start

17 with the date for the defendant's response and opposition to

18 the Government's motion.  Right now it's due the first.

19          MR. SERCARZ: How about the 15th, Your Honor?

20          THE COURT: Does that work for you, Mr. Tomao, in

21 terms of ordering the transcript?

22          MR. TOMAO: It sounds good, Your Honor, but as you

23 know we order a transcript it may not come as quicky as we

24 hope but I would say why don't we go with that and then if we

25 need to get --

1          THE COURT: I'd rather set up a schedule that
2  everybody knows that we're on.  So do you think the 22nd?
3          MR. TOMAO: Sounds good.
4          THE COURT: All right.  So let's do August 22nd for
5  the opposition and, Mr. Ott, for a reply.
6          MR. OTT: Two weeks out from there, Your Honor.  I'll
7  try to beat that date.
8          THE COURT: So that's the 5th -- sorry, hang on.  The
9  5th.
10          MR. SERCARZ: Your Honor, I'm going to have to in the
11  past when I want to order expedited I need the Court's order
12  on that.  It's a CJA so we'll submit the forms to your clerk
13  hopefully tomorrow, today or tomorrow if I get back to the
14  office in time.
15          MR. TOMAO: Your Honor, is Joseph Romano going to be
16  supplied with a transcript in time to make any submission he
17  would wish to make?
18          THE COURT: If you order the transcript, Mr. Ott, can
19  you provide -- mail him a copy?  Is that doable?  I don't know
20  what the best way to do this.
21          MR. OTT: Yes, I -- yes.  What I'll do is I'll order
22  the transcript and I'll distribute it.
23          THE COURT: Okay.  Thanks.
24          MR. TOMAO:  Just so I'm clear, the AUSA is going to
25  order the transcript and we'll get a copy and Mr. Romano will

1  get a copy.  Thank you.

2          MR. OTT: To reduce the administrative load I'll

3  order it.

4          THE COURT: Do we need anything else?  Agent, you're

5  free to step down.  Do we need anything else?

6          MR. OTT: No, Your Honor.

7          MR. SERCARZ: No, Your Honor.

8          THE COURT: So we'll get that --

9          MR. TOMAO: Just so we're clear, my submission on the

10  5th is anticipated as the reply which say the end of the

11  briefing?

12          THE COURT: Yes, that's it.  That's the end of it.

13  Thank you everyone.

14  (Proceedings concluded at 1:01 p.m.)

15                              *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5      _____

6                          Shari Riemer

7  Dated:  July 24, 2014

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25