1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


-------------------------------X

UNITED STATES OF AMERICA,           :
                                          CR-09-00170
      -against-                     :
                                          United States Courthouse
JOSEPH ROMANO,                      :   Central Islip, New York

          Defendant.               :   June 23, 2011
                                        3:00 p.m.
-------------------------------X


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE A. KATHLEEN TOMLINSON
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:        LORETTA E. LYNCH, ESQ.
                           UNITED STATES ATTORNEY
                           610 Federal Plaza
                           Central Islip, New York 11722
                           BY:  LARA TREINIS GATZ, ESQ.


For the Defendant:         VINCENT W. ANSANELLI, ESQ.
                                     and
                           MARK GOIDELL, ESQ.


Official Court Reporter:   Ellen S. Combs, CSR
                           100 Federal Plaza - Suite 1180
                           Central Islip, New York 11722
                           Phone (631) 712-6107
                           Fax (631) 712-6123


Proceedings recorded by mechanical stenography
Transcript produced by Computer

```
1                  (The following took place at 3:09 p.m.)

2                  THE CLERK:  Calling criminal case 09-170 United

3       States of America vs Joseph Romano.

4                  Please state your appearances for the record.

5                  MR. GOIDELL:  For the defendant, Mark Goidell.

6                  Good afternoon, your Honor.

7                  MR. ANSANELLI:  For the defendant, Vincent

8       Ansanelli.

9                  Good afternoon, judge.

10                 THE COURT:  Good afternoon.

11                 THE DEFENDANT:  Joseph Romano.

12                 THE COURT:  Okay.

13                 A VOICE:  Intern.

14                 THE COURT:  Okay, and we have sitting in the

15      gallery -- who is this, please?

16                 MR. GOIDELL:  Joseph Romano's wife.

17                 THE COURT:  Mr. Romano, you're consenting to

18      your wife being here.  Is that correct?

19                 THE DEFENDANT:  Yes, ma'am.

20                 THE COURT:  And who is sitting behind you?

21                 The marshals.  Excuse me.  How do I not know

22      that?

23                 All right, good afternoon.  I'm Magistrate Judge

24      Tomlinson.  I understand there is an application to

25      withdraw as counsel in this case, which Judge Bianco has
```

3

1  asked me to handle this afternoon.

2          I have gone through Mr. Ansanelli's memo that

3  you submitted in support of your motion to withdraw.  And

4  I am prepared to hear you further in this regard.  And

5  then I also want to hear from Mr. Romano.  All right?

6          MR. ANSANELLI:  Thank you, judge.

7          MR. GOIDELL:  Your Honor, I'm going to be

8  addressing the application, if that is agreeable with the

9  court?

10          THE COURT:  Go ahead.

11          MR. GOIDELL:  Does the court want me to do that

12  from here or from the podium?

13          THE COURT:  It might be easier for the court

14  reporter from the podium, so that she can hear through the

15  microphone.

16          MR. GOIDELL:  Thank you, judge.

17          Judge, there are some changes in circumstances

18  of those that were presented to the court in the proposed

19  declaration and the proposed memorandum of law.  And in

20  fact the situation has been exacerbated in recent days.

21  And I think that requires some explanation.

22          The extent of the mistrust between the defendant

23  and his counsel now is such that the defendant has accused

24  Mr. Ansanelli, I'm told by Mr. Ansanelli, of in essence

25  being in cahoots with the government.  And that there is a

4

1  system that's in place here which is designed to deprive

2  him of rights.  And that everybody including his own

3  counsel is a participant in that conspiracy.

4          And specifically, what Mr. Mr. Ansanelli was

5  accused of, was to use the colloquial, *tank* a bail

6  application that was brought not to long ago in the,

7  within the past month and-a-half.

8          THE COURT:  This was brought before Judge

9  Bianco?

10         MR. GOIDELL:  Yes.

11         THE COURT:  Okay.

12         MR. GOIDELL:  At a conference that immediately

13 preceded that bail hearing.

14         And as a result of those kinds of allegations,

15 as well as what has been presented in the declaration and

16 memorandum of law, there is a remarkable divergence at

17 this point.  We're being asked to advocate matters on

18 behalf of Mr. Romano which we simply in good faith can

19 not.

20         THE COURT:  All right, let me stop you for one

21 second, Mr. Goidell.  Because this is a sealed proceeding,

22 I'm going to ask you to go into specifics here.

23         It's my understanding that I'm the only one that

24 is going to hear this.  All right?  And so I would like

25 you to be as specific as you possibly can.

5

1        MR. GOIDELL:  I will, your Honor.

2        Your Honor, the defendant's current position is

3   that he would like his counsel, or demands, rather, that

4   his counsel argue that the prosecutor is engaged in

5   prosecutorial misconduct; that the system is corrupt; that

6   the court and his defense team are part and parcel of the

7   corruption that he perceives.

8        At this point in time in conjunction with that,

9   the defendant has changed his previous position and now he

10  would like us to advocate sentence mitigation.  We had

11  been prepared for a substantial period of time to file

12  objections to the facts presented in, many facts presented

13  in the presentence report, and to contest various

14  enhancements including the calculation of loss, the number

15  of victims, the vulnerability of victims, his role in the

16  offense, as well as to advocate for certain departures as

17  well as variances from the applicable guidelines.

18       Mr. Romano told us, *don't do that*; refused to

19  permit us to advocate on his behalf.  Instead he requested

20  or demanded that we instead move to vacate his plea.  We

21  advised him against vacating the plea in the strongest of

22  terms.  Only now --

23       THE COURT:  But now he changed his mind?

24       MR. GOIDELL:  Now Mr. Romano has changed his

25  mind.  As I understand, Mr. Romano has expressed to

6

1    Mr. Ansanelli as recently as this past week when

2    Mr. Ansanelli visited Mr. Romano at the jail, that, yes,

3    he wants us now to pursue sentence mitigation.

4           However, now in conjunction with that he wants

5    us to pursue all contentions available; that the process

6    and the participants in the process lack integrity and are

7    part and parcel of this conspiracy, that again he

8    perceives.

9           In addition to all of that, your Honor,

10   Mr. Romano has expressed to Mr. Ansanelli in the past, and

11   as recently as few days ago during a jail visit, that he

12   refuses to pay the outstanding fee.  There is a balance

13   that is owed of somewhere in the neighborhood of $70,000.

14   There are assets that are not subject to forfeiture, that

15   are available to pay the outstanding balance.  There are

16   assets that are available and not subject to forfeiture

17   that are available to pay the continued fee that is

18   required by the agreement with the defendant moving

19   forward.  And the defendant's position is simply that he

20   has paid up, and he is he not paying any more.

21          THE COURT:  Let me stop you for a minute.

22          What was the amount of the initial retainer?

23          MR. GOIDELL:  I'm going to have to defer to

24   Mr. Ansanelli.

25          MR. ANSANELLI:  $25,000, your Honor.

7

1        THE COURT:  And the $25,000 was paid?

2        MR. ANSANELLI:  The initial $25,000 has been

3   paid.  Subsequent bills had been rendered over and above

4   the original $25,000.  Those bills haven't been paid.

5   However --

6        THE COURT:  How much has been paid up until now?

7        MR. ANSANELLI:  We have been paid $230,000.

8        THE COURT:  All right, so to date you have been

9   paid $230,000?

10        MR. ANSANELLI:  Sorry, judge?

11        THE COURT:  To date you have been paid $230,000.

12        MR. ANSANELLI:  That's correct.

13        THE COURT:  He still owes you according to your

14   calculations about $70,000.

15        MR. ANSANELLI:  Exactly closer to $79,000 judge.

16   And we have asked Mr. Romano for an additional retainer

17   going forward as well.  We combined the initial retainer

18   with the work remaining, as well as the outstanding

19   balance.  We have asked Mr. Romano for $125,000 to address

20   the past due balance, as well as the money that would need

21   to be paid for going forward.

22        THE COURT:  All right.  Thank you.

23        MR. GOIDELL:  And if I may, your Honor, the work

24   that has been performed for Mr. Romano is detailed in

25   Mr. Ansanelli's declaration.

8

1          THE COURT:  Yes.  I saw that.

2          MR. GOIDELL:  And the work that is still

3    required to be done on his behalf is voluminous if we are

4    in fact permitted to do the attorney's job, rather than to

5    be restrained in the way that Mr. Romano is.  So, there

6    are literally tens of thousands of pages of documents that

7    need to be culled, reviewed, collated, reorganized to

8    submit an order, to make a factual demonstration necessary

9    for a Fatico Hearing, and then to attempt to prove our

10   contentions at those hearings.  And then of course the

11   time we need for the preparation of all documents in

12   connection with the presentence, or the appropriate

13   sentence advocacy.

14         THE COURT:  All right, let me just -- I want to

15   make sure I have this clear.

16         I'm going to let you address this a moment

17   yourself, Mr. Romano.

18         You say that he is demanding that counsel argue

19   prosecutorial misconduct.  Is that still the case?

20         MR. GOIDELL:  Yes, as of two days, three days

21   ago, yes.

22         THE COURT:  Okay.  And with reference to his

23   team being part of the corruption, he still wants that

24   argued as well, according to what you believe is the case

25   right now?

9

1        MR. GOIDELL:  Yes.

2        THE COURT:  Okay.  But that he has not any

3    longer asked for his plea to be rescinded, but that he

4    does want you to argue for mitigation with regard to the

5    various aspects of mitigation, along with the defense of

6    the number of victims, et cetera, as well as variances

7    from the applicable federal sentencing guidelines.

8    Correct?

9        MR. GOIDELL:  That's correct.

10       THE COURT:  Okay.  And he also wants it to be

11   argued that the participants here are, all lack integrity?

12       MR. GOIDELL:  That's correct.

13       THE COURT:  Okay.  And the rest has to do with

14   the amount of money that is owed according to counsel for

15   the services rendered and to be rendered.  Right?

16       MR. GOIDELL:  That is also correct.

17       THE COURT:  All right thank you?

18       Mr. Romano this is your opportunity to be heard

19   on this application.

20       THE DEFENDANT:  Yes, ma'am.

21       Would you like me to stand at podium.

22       THE COURT:  I just need to make sure, if you can

23   move the mike over directly in front of him.

24       THE DEFENDANT:  Can I talk without the mike so

25   that you can hear me?  This is really bad, and I really

10

1    can't hear myself from the reverberation.

2              THE COURT:  Well, we'll see how it works for the

3    court reporter.  If she tells me she needs the mike I'm

4    probably going to put it on the mike.  Go ahead.

5              THE DEFENDANT:  You want me to do it from --

6              THE COURT:  You can sit.  That's fine.

7              THE DEFENDANT:  Your Honor, I really don't know

8    how to answer these things in really a simple way, you

9    know.  And I have to tell you I'm very happy with the work

10   that Mr. Ansanelli has done in the past.  And referring to

11   trust issues, or trying to make me sound like I'm

12   psychotic, like I think the whole world is against me.

13   I'm paranoid.  I think that's ridiculous.  Okay?

14             First of all, I have to explain the story to you

15   but I have to go back a little ways.  When I first came

16   into the courtroom I was -- I hired Charles Carnesi.  I

17   have never been in any trouble to speak of before in my

18   life, and I didn't know how this went.

19             I really, I was here I am with a federal

20   indictment I'm sitting at home and I'm thinking, well

21   okay, here I am under a federal indictment.  I'll simply

22   get a lawyer and we'll straighten this out.

23             Well, there is a couple of bad things that

24   happened along the way.  I was referred to this Charlie

25   Carnesi, who you know he is a known Mafia attorney.  And I

11

1    have to tell you, I didn't know that.  He was referred by

2    a personal friend of both mine and my wife.

3          And my wife, and she said to me she -- I told

4    her, I said, Listen, this is a Greg Gallo who said this is

5    a good attorney.  And he's a great attorney.  He works in

6    the federal system, so on and so forth.  And I hired this

7    man.  He said to me that he gets $100,000 for everything

8    proceeding up until trial.  Okay.

9          I'm a man who has paid my bills.  I don't owe

10   anybody anything.  Actually when I had to hand over a

11   sheet, you want to know what credit card bills I have.  I

12   don't owe anybody anything.  I paid all my bills.  I live

13   within my means, and I don't ask anybody for anything.

14         I paid this man his hundred thousand dollars.

15   And I told him I said -- he came to visit me in one of my

16   apartments in Manhattan.  I told him, I said, You know, if

17   there's, if there's one bit of illegitimate money that

18   came, that filtered through me while I'm retiring in

19   Florida, I said, then you give back.  You call up the

20   prosecutor.  You give back every single dime of everything

21   I have because I don't need anything.  I don't need even a

22   house.  I can build my own house, just like I have built

23   all my houses.

24         Well, I think they were part of -- because I was

25   given this referral by this Greg Gallo, he somehow let him

12

1  know that I had a lot of money.

2          Well, I don't think this man has got my best

3  interests at heart.  And he says -- I tried to call him,

4  and I told him, Did you get in touch with the prosecutor?

5  It's a phone call.

6          A couple of months went by.  And in the meantime

7  he calls me back up and he says to me some three months

8  after I'm indicted, he says, Yeah, the prosecutor wants

9  you to take a plea of ten years.

10          I told him, Ten years?  I don't know what you're

11  talking about here.  And I start to understand the

12  seriousness of it and I realize, you know, this is my man,

13  he's a top notch attorney known by everybody.

14          Well, what happened is he strung me along.  He

15  has -- as you know, my bail was, was revoked.  I needed

16  money.  I've sat there.  I told you where am I going to

17  get money like this to give you?  I have some money but I

18  have bills.  I have mortgages to pay.  I have people I owe

19  money to.  I don't walk around not paying people.  And

20  like they're saying to me here -- I pay people.

21          Well, he said to me -- I told him, I said, You

22  know I need to -- I need to make money to pay you.  What

23  am I going to do?

24          Well, I'm not going to blame him.  I'm 48 years

25  old.  I accept responsibility for what I do.  Okay.

13

1    Sometimes, sometimes I'm in a position of authority which

2    is usually always, I always accept responsibility for my

3    underlings.

4          Well, Mr. Carnesi said, Well, if you go and you

5    get involved in the, in the telemarketing, which is what I

6    did as you know.  I was consulting for that firm.  And

7    quite frankly, yeah, they could have never been

8    established without me consulting them on how to go ahead

9    and build a coin company.

10          Of course what's happened in the past has been,

11    that I've been told what happened there, and committed

12    other crimes.  And you know, these types of things I

13    didn't go ahead and commit the crimes that I knew about in

14    the first place.  Okay.  Was I aware of what went on and

15    what you call fraud?  Yeah, I've heard that.  Yes, I've

16    heard them say it.  I've heard some of the salesmen say,

17    I've admitted that.  I understand that.

18          Why didn't I do anything?  Certainly because of

19    money.  However, when I went to this other place and I

20    consulted, to think, to think that I would go there and

21    teach them how to do something that I didn't teach people

22    how to do in the first place, is absolutely absurd.

23          MR. GOIDELL:  May I interrupt very briefly?  I'm

24    very sorry, Mr. Romano.  Your Honor, may I, please?

25          THE COURT:  Go ahead.

14

1          MR. GOIDELL:  I just want to advise the

2    defendant, while these proceedings are sealed, and I

3    presume that they will not be subject to an inspection by

4    the prosecutor and hopefully by District Judge Bianco --

5          THE COURT:  That is one of the things here, yes.

6    But I understand your concern for what information is

7    being proffered by Mr. Romano.  And if you want, I'll give

8    that instruction.  All right?

9          MR. GOIDELL:  Yes, thank you.  We do have a

10   legitimate concern that what he is saying jeopardizes the

11   acceptance of responsibility.

12         THE COURT:  Mr. Romano, just so you understand.

13   This record is going to be sealed, and no one else is

14   going to see it; neither Judge Bianco, nor any of the

15   prosecutors in the case.

16         But what your lawyers are concerned about,

17   rightfully so, is that any statements that you make here

18   that could be of an incriminating nature in any way; I

19   need to caution you that that may not be the direction you

20   want to go in here.  And the whole point of this

21   proceeding is to determine whether or not you want to

22   proceed with your current counsel.  And I have to make a

23   determination whether there is a conflict at this point

24   with your current counsel.

25         So it would be, I think very helpful to you, to

15

1    try to narrow the universe of information that you want to

2    give to me at this point.  All right?

3              THE DEFENDANT:  Yes, your Honor.  I understand

4    completely.  And I will give you the condensed version,

5    reduced version.

6              I think the issue that the gentlemen have is

7    about acceptance of responsibility.  And I think you know

8    what I wanted to say in that matter is, I have accepted

9    responsibility.  And I'm not, I'm not pushing myself away

10   from the acceptance of responsibility and saying this.  As

11   I said, what I perceived to be non-criminal was something

12   that I went back into.  Okay.  I'm not saying that I

13   didn't do anything that was criminal.  But I will condense

14   this whole thing for you.

15             My bail was revoked.  I had to go to trial.  I

16   was not offered any type of plea agreement.

17             I showed up at the trial, and Carnesi used the

18   fact that I was in jail.  His advice to me was, well you

19   know, if you get caught, he says, I'll simply go there and

20   I'll get you out.  I'll get you back out on bail.  It was

21   a very, very poor judgment on my part.  I understand that.

22             Well, that was some 15 months ago that I have

23   been in the Nassau County Jail.  He used, he used the fact

24   that I'm locked up in jail, and he was the in between,

25   between myself and my wife.  It was very hard to

16

1    communicate in person.

2           And he ended up collecting another $200,000 from

3    me.  He said he needs to be paid $200,000 before it goes

4    to trial.

5           Well, I walk into the courtroom and him and all

6    of the attorneys which he told me he needed to get my

7    brothers all new attorneys, all his so-called friends -- I

8    walk into a courtroom and they say to me, No, we can't

9    take this to trial.  They're going to give you 17 years.

10   And they did a whole scare tactic.

11          And I say to my brothers, I said, Listen, I

12   don't understand you guys.  We're taking this to trial.  I

13   said, Are you kidding me?

14          They said, No, we want you to take a plea.  You

15   need to take a plea.  I was bombarded by all three

16   attorneys, Charles Carnesi included.  He was paid

17   $200,000, and I took the plea.

18          He said to me -- I told him at the desk, I said,

19   Well, what about the $200,000 because you told me $100,000

20   between now and trial.  Well we're not going to trial.

21          He says, No, I never said that.

22          I said, Well what do you mean you never said

23   that?  You've said that.  With that we moved onto -- we

24   fired him.  We fired him, and I moved on with Mr.

25   Ansanelli.  The way I found Mr. Ansanelli was through

1  Brian Aryai (ph) who is a retired FBI agent who does

2  forensic work.

3        Well, after the plea I hired these gentlemen

4  post-plea.  I told them that I would like to -- I would

5  like to stay with the plea.  I don't want to go ahead with

6  this trial.  Lets stick with the plea and we'll work on

7  mitigating circumstances, so on and so forth.  A retainer,

8  as I said was $25,000.  And I have incurred $230,000 worth

9  of bills.  In the meantime it's not just $230,000.  There

10  is this Brian Aryai.  He was going to be the forensic

11  accountant.

12        Well, the forensic accountant, what I understood

13  the forensic accountant for, is he is going to take the $7

14  million that I pleaded guilty to, okay, and he is going to

15  condense that into a smaller figure so I don't get hit

16  with some 10 or 20 points.  I believe it was 20 points

17  added on to the -- I don't know --

18        THE COURT:  It's called the amount of loss with

19  regard to the fraud.  Correct?

20        THE DEFENDANT:  The what?

21        THE COURT:  The amount of loss with regard to

22  the fraud.

23        THE DEFENDANT:  Yes.  But on the sentencing

24  table, the sentences guideline, the base number for that

25  is the 6 points.  You add 20, you're talking about 26.

18

1    And now we have enhancements that the government is trying

2    to bring forth and forward.  And this is what my problem

3    is.

4            I paid Brian Aryai $50,000.  Now that's

5    $280,000.  I have a contract here.  If you would like to

6    see the contract I can present it to you.  And it's signed

7    by Mr. Ansanelli.  And it says that, there is one sentence

8    in there that says that he directs everything that this

9    Brian Aryai is going to do.

10            Well that's fine, except for we sent Brian

11   Aryai, we sent him down to Florida.  And I told Brian

12   Aryai through other sources, I said, You know, I can

13   understand taking a plea agreement.  But this judge has

14   to, this judge has no clue who I am as a human being.  He

15   thinks I'm the worst guy in creation.  All he has to do is

16   read anything that the government says, the PSI report

17   which was rubber stamped, or read the newspapers.

18            According to the Newsday I'm a Mafia Don.

19   Well, we sent him down to Florida and gave him the

20   direction.  I said, Go and interview these people, okay?

21   They didn't say those things.  They're lies.  Just go

22   interview them.  There's no way these people are going to

23   be able to say that about me.  They know who I am.  They

24   know what I've done with them, and they know who I am as a

25   friend.  And not that I'm looking for any kind of lawyer

**19**

1    who will do favors for them.  But they're -- some of these

2    people were decent people, and they were pressured.

3          While I sent Brian Aryai down to interview these

4    people, he's interviewing Dave Murkovitz (ph) that was the

5    owner of Collectible Coins, CCI in Florida.

6          THE COURT:  Yes.

7          THE DEFENDANT:  He interviews David Murkovitz.

8    And the reason why he interviewed him is because David

9    Murkovitz changed his story.  He changed his story about

10   it a couple of times.  He's a wishy washy guy.  And he sat

11   there and he told -- he gave one version, and then all of

12   a sudden he changes it around.  He's a cooperating witness

13   with a no prosecution agreement.  And he's in cahoots with

14   the government.

15          You know, I'm not mad at these people.  I'm not

16   mad at these people at all.  I just, I just feel that it's

17   wrong.  They were somehow pressured.  We sent Brian Aryai

18   down to Florida.  And as he is interviewing David

19   Murkovitz he gets a phone call on his cell phone from an

20   attorney who was given to him by Charles Carnesi.  Well,

21   with that he is talking to Brian Aryai, he opens up the

22   cell phone and he says, Hello.  And he puts him on speaker

23   phone in front of Brian Aryai, who's, who's word is

24   impeccable.  He has a top secret clearance.  And he

25   informed me that he would testify to these facts, because

1    what I have learned I need to be able to prove everything

2    that I said.  Well I can.

3           And he said, this Jason Wanderer (ph), I believe

4    that's his name, he said that Lara Gatz's office called

5    him and told him, said for to him tell David Murkovitz

6    don't talk to Romano's people if they go down there,

7    because we have Charles Carnesi, he's under investigation.

8    They're trying to investigate him.  And don't talk to

9    those people.  They just want to investigate Charles

10   Carnesi.

11          Now, I don't know anything.  I really don't know

12   too much about the law, only what I've read in the past

13   year which, which now is a lot.

14          I asked Brian Aryai, I asked Vincent Ansanelli,

15   I asked Tom Cleary (ph) who was, who was part of

16   Mr. Ansanelli's team.  And my answer was, the answer they

17   gave me was, that that is absolutely absurd, nobody does

18   that.  That is wrong to do such a thing.

19          Well, this is how the process took place.  And

20   my wife had also taped this Charles Carnesi who pretended

21   he didn't collect all these monies that went to him.  As

22   well as, we have, we paid his -- we paid his private

23   investigators who mysteriously folded tent when we tried

24   to find them, when we tried to call them and asked them,

25   Well, where is all the information about all of these

**21**

1  people you interviewed?

2          My point is, your Honor, that I took a guilty

3  plea.  But I wanted to tell the judge, you know, I don't

4  know what you've heard, or what you've read, or what

5  you've seen, or what the government had handed over, or

6  what the PSI report was rubber stamped about.  I don't, I

7  don't know what you've heard.  But I wanted you to know

8  that I took a plea.  And the have a whole assortment of

9  people who sit there and boldfaced lie to people.  Okay.

10  And they have -- there are people who have recanted their

11  statements.

12          THE COURT:  Who is the they, just so I

13  understand?

14          THE DEFENDANT:  The cooperating witnesses.  They

15  interviewed, they interviewed -- and this is what I've

16  heard because I speak to these people -- they interviewed

17  two of my secretaries.  They accused me of fathering a

18  baby of one of the secretaries.  This is Lara Gatz who I'm

19  talking about.  They accused me of fathering a baby to my

20  secretary.  They accused me of having sex with the other

21  secretary.

22          Judge Tomlinson, you know I, if that were true,

23  it has nothing to do with this case.

24          THE COURT:  Well, let me ask you a question.

25  Pardon me for interrupting you.

22

1          Is that information contained in the presentence

2     report?

3          THE DEFENDANT:  Absolutely not.

4          THE COURT:  Okay.

5          THE DEFENDANT:  And Mr. Ansanelli can tell you

6     that we sat there in the PSI, and gave a PSI report.  And

7     the only thing that comes out of my mouth is the truth.

8     And you know, I have a PSI report here that I can not

9     believe.  I can not believe that this is what this man

10    wrote.

11         THE COURT:  Well all right, let me stop you

12    there for a moment.

13         Because part of what the defendant's counsel

14    particularly does in those circumstances is, once the PSI

15    is produced your counsel has an opportunity to file a

16    written response in the form of objections back to the

17    person who prepared the presentence report to see if some

18    of this can be rectified.

19         And if it's rectified, great.  It will be

20    published in an addendum to the presentence investigation

21    report that then goes back to Judge Bianco.  If they can't

22    reconcile it, your counsel still has the right to raise

23    those objections with Judge Bianco at the time of

24    sentencing.  And many of the attorneys do this in the form

25    of preparing a sentencing memorandum, which is what I

23

1   assume your counsel was referring to earlier.  And in that

2   sentencing memorandum they're going to deal with the

3   issues that are in the presentence report that you have

4   concerns about.  And they're also going to bring in any

5   other factors about you that they think the court should

6   take into account with regard to you as a person who is

7   about to be sentenced here, based upon the plea that you

8   took.

9           They also have the right to raise issues of law

10  with regard to the sentence.  For example, you were

11  talking earlier about mitigating factors.  They should be

12  taken into account.  For example, one of the things that

13  you mentioned and raised was the -- one second, I'll go

14  back to this -- your role in the offense, and the number

15  of victims for example.

16          I understand that you now do want counsel to

17  argue mitigation, to argue those factors, which is what

18  typically is done here by defense counsel when somebody is

19  getting ready for sentencing.  So I'm still trying to get

20  back to understanding what differences you have with your

21  current counsel, number 1.

22          Number 2, whether you want them to continue

23  representing you.

24          And number 3, whether there's grounds here for

25  me to establish that there's some kind of a conflict.

24

1          That is what I'm trying to get at.  Counsel has

2     indicated to me that he believes there is a conflict here.

3     That's why I'm trying to get more information from you.

4          THE DEFENDANT:  I believe the conflict that he

5     is speaking about is a trust issue.  And I can tell you I

6     think that they have an associate that works with them,

7     Ellen Kugler (ph), who is an incredible human being.  She

8     does, she does her work.  She's sincere.  She's a

9     humanitarian.  And you know what, I think their office

10    does do a great job, and does not -- I don't not trust

11    them.  You know.  I don't not trust them.  You know I, I

12    can work very well with these people.  I live in a very

13    volatile environment with bad people and gang members, and

14    I manage to, I manage to keep people in order in that

15    environment.

16          I certainly have no difficulty with running with

17    Mr. Ansanelli.  I know -- I am not going to -- I will not

18    hold him accountable if I happen to disagree with a way

19    that a procedure is going.  The problem is, is that I

20    would like to be approached straightforward.  Don't -- you

21    can not show up to me after a hearing and tell me about,

22    well you need to hand me $150,000 just because I was

23    turned down on bail.  I feel that that is a tactic.  And

24    I, and that's the only issue that I would have in terms

25    of; don't use the fact that I'm turned down at a bail

1  hearing.

2          THE COURT:  Well, let me stop you there for a

3  moment again.

4          I want you to try for a moment, because I have

5  to look at two issues here.  One is, there are several

6  grounds that have been raised by counsel here.  One is the

7  non-payment of fees.  The other is the conflict between

8  you.  And the conflict, meaning from the standpoint of the

9  attorney-client relationship, and whether or not that is

10  so severely impaired that they feel they can't represent

11  you as you should be represented for purposes of

12  sentencing.  And I'm trying find out from you if you feel

13  that's the case.  If you do, then I want you to tell me,

14  yes, that's the case and explain to me why.

15          If you don't think that's the circumstance, and

16  you don't feel you have a conflict, and you want them to

17  continue representing you, then you have to tell me that.

18          Part of the conflict that they're raising is

19  that there are various things that they would normally

20  proceed to argue on your behalf at sentencing as

21  mitigation factors.  Obviously there was some point in

22  time that there was a disagreement with regard to this,

23  because you were indicating at some point, I believe, that

24  you wanted to revoke your plea.  You've now said that is

25  not the case.  And you want them to go ahead and deal with

26

1    and argue mitigation of these factors for purposes of your

2    sentencing.

3            So, I need to get from you some direct answers

4    to those questions.

5            THE DEFENDANT:  Okay.

6            THE COURT:  And try separating your mind and

7    your discussion for the moment, the money issue versus the

8    conflict issue.  Okay?

9            THE DEFENDANT:  I have to tell you, I don't

10   believe that there's a conflict issue.  I believe what

11   went on is, and if it wasn't done the way it just pours

12   out to you when you say it -- when we thought, when I

13   thought about taking the plea back, we decided that we

14   wanted to take a back seat and see how my brothers' trial

15   turned out.  That's why I told -- I said, listen you need,

16   we need to start thinking about removing the plea.  I

17   said, I'm very unhappy with the fact of sitting here with

18   this plea agreement and the way things are transpiring.

19           The PSI report that came out and was

20   devastating, was devastating.  When I spoke to Tom Cleary,

21   the counsel who worked for Mr. Ansanelli, he told me that

22   he answered that.  He could not believe that that PSI was

23   the one that was, that was for me.  He answered it word

24   for word.

25           Why we're sitting on waiting all these weeks,

27

1   six weeks to have the PSI answered.  I don't understand

2   that.

3         My only argument is, all the time the same

4   thing.  Every time I meet with Ansanelli, I said, So Judge

5   Bianco at this -- currently thinks that I'm the unabomber,

6   because he has never been told anything else.  We're

7   talking about I was originally arrested in November of

8   2008.  We're talking about two and-a-half, three possibly

9   three years ago almost.  And Judge Bianco only knows me as

10  a person whose purposely not showing up to court, or a

11  person who, who just does what he wants.  And to

12  paraphrase Judge Bianco, flagrantly going back into the

13  coin business.

14        This may be an impression that I believe that

15  the prosecutor wants to show everybody.  I believe that.

16  But that is not the case.  And the issues that both myself

17  and Mr. Ansanelli have are, they all boil down to money.

18        Why isn't the PSI answered?  Because he wants me

19  to hand him over $50,000.  I'm in the Nassau County Jail.

20  Money does not fall out of a tree.  There has been money

21  taken away from me.  I'm working off rentals.  When they

22  say that I have properties and I have all this, I guess

23  everybody knows what I have.  I'm supposed to take a

24  $500,000 home and sell it for $100,000 to hand it over to

25  Mr. Ansanelli.

1          And the problem I had is, as I said, this was in

2    my letter to the judge from my wife; is, if that's the

3    case, let me go and hand the property over to one of the

4    victims, because money don't mean anything to me.  But to

5    sit there and waste and to destroy things, it just doesn't

6    work according to the way that everybody would like.

7          If I was sitting here on all kinds of money that

8    I could just, that I could burn through, if I could sign a

9    blank check and have Mr. Ansanelli work off it without

10   having to worry if my wife or my children are going to be

11   able to pay the bills, which I still maintain some eleven

12   houses and everything else for that matter, okay.  Where

13   are they supposed to go?  What am I supposed to do with

14   this?  And this is something I believe after paying

15   $280,000, some of the stuff should have been done already.

16          THE COURT:  All right.  But you understand that

17   right now you're not prejudiced because --

18          I'm going to let you talk, ma'am, just bear with

19   me a minute.

20          You're not prejudiced from the standpoint that

21   your ability to respond, or counsel's ability to respond

22   with regard to the objections to what is in the

23   presentence report, you still have the opportunity to do

24   that.  That is not bypassed in any way.  All right?  And

25   so those arguments will be made on sentencing by whoever

**29**

1  is representing; you whether it's these folks or somebody

2  else.

3          So that I want you to understand is not an issue

4  here.  You still have the right and you still have the

5  opportunity to bring that information to the attention of

6  Judge Bianco.

7          The real issue here is; aside from the money

8  which is I understand a significant issue to everybody,

9  but it's one issue out of two that we have to deal with

10 here.  The other one is whether or not you believe you can

11 continue to work to assist counsel here in your defense to

12 prepare for your sentencing.  And that you can continue to

13 work with them to get to a point where they can make the

14 best possible case for you by way of arguing mitigation

15 for example at your sentencing.  And you have tell me if

16 you think you can do that.

17          THE DEFENDANT:  Yes, I absolutely can.  I have

18 no problem with anyone in this world, and especially a man

19 who has helped me.  The issue here basically is two simple

20 things.  Money, and how fast it gets over to Mr.

21 Ansanelli.  And the other issue is when I -- to answer

22 what they said, I'm not paranoid about the system.  And

23 what I believe the system to be, whether I believe it's

24 corrupt or what have you, that's not something that -- I

25 don't think that should be brought out loud.  These are my

30

1    personal opinions about things.

2            THE COURT:  Well, that is important, because if

3    you're asking them to argue something like that for you in

4    that sentencing, I can understand why they're having

5    difficulty.

6            THE DEFENDANT:  No, I'm not.  I did not ask them

7    to argue whether or not I think something is corrupt.

8    Okay?

9            The problem is, is I believe, I really believe

10   that this prosecutor, okay, goes out of her way -- and I

11   have read, I've read this, this whole entire stack here

12   about -- and it doesn't make me an expert on prosecution

13   misconduct.  And you know what?  I'm -- she falls under

14   this, under so many things here.  It's almost unfair that

15   someone has to sit here and be subjected to the things

16   that she said and nobody will address this.

17           And so I asked Mr. Ansanelli, can I address it?

18   I want to address it.  Why?  I'm told I'm not -- I'm

19   looking at 12 to 15 years.  You know a condemned man has

20   very little fear.  I am not -- I will -- if I believe it's

21   a full blown liar, I believe she's out of line.  And she

22   is.

23           THE COURT:  All right, so let me stop you there.

24           The real issue here, and we have to put this in

25   some kind of context.  You have taken a plea.  Correct?

31

1          THE DEFENDANT:  Correct.

2          THE COURT:  So you've admitted your guilt.

3          THE DEFENDANT:  Correct.

4          THE COURT:  Whatever prosecutorial misconduct

5    you're referring to, I don't know what that has to do with

6    your sentencing or anything that is in the presentence

7    interview.  I suspect it's not in there.

8          Whatever arguments the government is going to

9    make at sentencing, with regard to what they believe

10   should be done with regard to sentencing, it is why you

11   have counsel to represent you to refute those arguments.

12         I don't -- arguing that there is some form of

13   prosecutorial misconduct here that you think is going to

14   impact your sentencing is a little divergent here.  You

15   may feel that way, but I'm saying to you that you, you

16   know, you have a right to feel that way.  That is entirely

17   up to you.  You're the one who is living through these

18   circumstances.

19         But it puts them at a disadvantage in terms of

20   how you argue, that somehow there has been prosecutorial

21   misconduct here, particularly because of the fact that you

22   have taken a plea.  What you need to focus on is what you

23   pled to and what arguments they can make on your behalf

24   with regard to mitigating the number that you're concerned

25   about, the enhancements to your sentence.  Right?

32

1           THE DEFENDANT:  Correct.

2           THE COURT:  And the question is, can you do that

3    with them, without putting them in a position of having to

4    argue things that are not going to really support your

5    claim for those.  Whether or not there has been -- and

6    look, I'm not taking a position on this one way or the

7    other, I'm just trying to make you understand -- whether

8    or not there is prosecutorial misconduct has very little

9    to do with whatever sentence you're going to get based on

10   the plea that you took.  Do you understand?

11          Now you know what's significant to you, what is

12   really outside the box of what the court is going to look

13   at here with regard to the plea that you took, and what

14   sentence is properly imposed here.  There are other things

15   here that your counsel can argue that are much more

16   relevant to what Judge Bianco is going to be looking at.

17   And I just need to make sure that you understand that.

18          THE DEFENDANT:  I understand what you're saying,

19   your Honor.  Except that you know what we're failing to

20   look at is the fact that I paid $50,000 to a man to go

21   down and interview people.  And all of a sudden there's

22   this whole scenario going on.  And it's -- I've been

23   billed for it.  It's been talked about.  It's been -- I've

24   been charged an exuberant amount of money for it as well

25   as paying the $50,000.  So if that has nothing to do with

33

1  anything, I don't think it's some big giant surprise that

2  -- I don't know, look at me, I'm off the hook because I

3  found someone else doing the wrong thing.  I don't think

4  that by any stretch of the imagination.

5        But I certainly don't think for one second that

6  a person who's in a position where people sit around and

7  they, they bequeath to someone who's part of the

8  government, honesty and they stand for something.  They

9  stand for the United States of America against me.  And

10  that's the type of things that go on?

11        I mean there was an instance today where we sat

12  here and we had a hearing.  And you have the prosecutor,

13  who is very aggressive, and takes a position that there

14  are, there are 187 statements.  And we gave them to

15  people.  And we know full well that they weren't given,

16  and we weren't given anything.  We're not given the

17  opportunity to view things.

18        And again, I just -- the problem I have is, I

19  tell Mr. Ansanelli is, I need a forum to say these things.

20  Because your Honor, I can own what's mine, okay?  I can do

21  that.  I'm a very big boy.  I served this country

22  honorably.  I'm a pilot.  I flew airplanes and helicopters

23  and aerobatics.  I know what's mine.  I know what I can

24  own up to.  I'm a stand-up person.  I'm a handshake guy.

25  And I have to, I have to sit around and, and take this?

34

1          I don't know why?  I don't know why, if you,

2     your Honor would look at me saying something like this,

3     and then sentencing me.  I mean you, you have to be able

4     to separate the two.  Alls I'm saying is, why can't we

5     point these things out?  It's not right that this is being

6     done.  It's an abuse of power.

7          THE COURT:  Well look, that's one of the things

8     I suggest that you will likely talk to whoever is

9     representing you for purposes of sentencing and to what is

10    appropriate.  And if you want to express your belief and

11    have your counsel express that that's your belief, then

12    that is something you can talk to your counsel about.  All

13    right?

14         Your wife was anxiously waiting to tell me

15    something.  Go ahead.

16         MRS. ROMANO:  Thank you, your Honor.

17         THE COURT:  I'm going to have to make you come

18    to the podium.

19         MRS. ROMANO:  The only problem that we've had

20    for any of this, and the only conflict we have right now

21    is as I see it is the money.  I had retained

22    Mr. Ansanelli's office in October for $25,000.  I was --

23    it never happened to me before.  I mean this situation was

24    explained to Mr. Ansanelli what happened and what

25    transpired that we feel obviously is not right.  And

35

1    Mr. Ansanelli promised me that he would be forthcoming,

2    and help my family, and represent my husband, and come

3    forward to the judge, and help me, and said a lot of

4    things.  And I trusted him, and I trusted Brian.  And it

5    was a matter of trust for me to them and especially the

6    situation.  I'm alone.  I have three children, my husband

7    is in jail.

8         He was very -- I see all the work he did.  I

9    like Tom Cleary.  They sent me bills, I would pay them.  I

10   sold one of the condos in Manhattan, and that's what

11   provided me an opportunity to find him a new counsel.  As

12   soon as the money runs out, and basically which was

13   coincidentally the same time my brother in-law's trial

14   started, we decided, Joe and I, let's wait and see what

15   happens with Michael.  We don't know how this is

16   transpiring.  We don't know what this all means.  And it's

17   a scary thought to know that your husband is facing 15

18   years.  I have three children.

19        In the end it was a money thing.  And as soon as

20   I could not pay those bills any more, which I have my

21   children to feed, Mr. Ansanelli turned on me.  He told me

22   that if I didn't pay him the money that he no longer would

23   represent me.  And that was the only conflict we had.

24   Because other than that, he was doing a great job.

25        I spoke to Tom Cleary who is no longer at the

36

1    firm, that Mr. Ansanelli never told us to this day that

2    Mr. Cleary had gone.  And I spoke to Tom Cleary about all

3    of these anxieties and money issues and financial

4    situations to Mr. Cleary.

5            And he told me, Karen what you paid is enough.

6    Okay?  And you need to stand ground because they'll, they

7    will take everything.  And I at that point I was draining

8    my account.  I was down to like whatever I had to do just

9    to survive with my kids.  As soon as the money ran out

10   that was when Mr. Ansanelli turned.  And all of a sudden

11   it was a problem.

12           My feeling is that we gave him a lot of money.

13   And the billing that I saw on the invoices were

14   ridiculous.  He is charging me $325 an hour.  Okay?  And

15   every time I pay a bill I would get one in the mail the

16   next day.

17           I understand that what he is doing is, is

18   helping my family, is for the benefit of my family.  But I

19   was overbilled -- tremendously.  And we can go down that

20   list of invoices.  He was charging me, for an example, for

21   Aryai.  They were charging me just to talk to one another.

22   The billing is -- it's as far as I'm concerned, I'm being

23   overcharged.  And that bill needs to be looked over.  And

24   I think at some point there should be a resolution between

25   what a fixed rate is, what we're actually paying for, and

37

1    in order to get his sentencing done and over with.  That

2    is all we want.

3           And if Mr. Ansanelli wants another $150,000 for,

4    for I don't know what, because we're going to end up with

5    the same circumstances, the same sentencing.  I don't

6    understand why he would want, and why he wants all this

7    money.  Especially knowing what I gave him already, and

8    what he overbilled me on.  So if Mr. Ansanelli wants to

9    sit down and go through the bills line by line, I can go

10   to his office and do that.  Because there is a lot of

11   discrepancies that I see.  And maybe we can somehow fix,

12   fix the balance and the rate, and maybe we can come to a

13   fixed possible rate much less than $150,000 to finish the

14   sentencing, so that we can proceed and we can move on with

15   our lives.

16          Because obviously my life will never be the same

17   again.  But I'm not going to sit here and make my children

18   suffer any more, not financially either for, for the

19   problems that we do have.  I have three children.  And I

20   have bills to pay.  And I'm not going to give it to

21   another attorney.  I would rather give it to the victims.

22   That's it.

23          THE COURT:  All right.

24          Mr. Goidell, do you want to have a brief

25   rebuttal?

1          MR. GOIDELL:  Yes.  Thank you, judge.

2          Judge, some of the specifics that related to

3    conversations with Mr. Ansanelli I'm going to refer to

4    Mr. Ansanelli.  He'll address those individually.

5          I will say a few things.  There was a direct,

6    direct mandate from Mr. Romano to do nothing with respect

7    to sentence, to refrain from filing objections, to refrain

8    from any sentence work while he contemplated whether or

9    not to direct us to move to vacate the plea.  And there

10   was a direction to look into the propriety of moving to

11   vacate the plea.

12         There was a specific direction from Mr. Romano

13   just a few days ago that he wanted his counsel to advocate

14   the things that he just articulated to the court on his

15   behalf; the prosecutorial misconduct, the absence of

16   integrity of the court.  And in addition to that,

17   expressly accused us of being involved in this conspiracy

18   against him.  I didn't hear Mr. Romano address that in any

19   way, shape, or form.

20         MRS. ROMANO:  I can address that.

21         THE COURT:  One moment.

22         MR. GOIDELL:  My understanding is that that

23   conversation occurred between two people, Mr. Ansanelli

24   and Mr. Romano.

25         What I am hearing with respect to the payment of

1   the fees; first of all, I think the court should

2   understand that this monthly billing in the firm, I

3   believe Mr. Ansanelli has addressed this more

4   specifically, that every month an invoice goes out.  There

5   has never once, as I understand it, been any objection

6   whatsoever to any of the invoices that have been presented

7   to Mr. Romano or to his wife.  There has never been any

8   suggestion of excessive billing, double billing, or

9   anything of that nature until now.

10          With equal emphasis I submit to the court that

11  what we're hearing now is simply a refusal to pay, for

12  whatever reason; whether it's because Mrs. Romano or

13  Mr. Romano disagreed with the billing; they don't like the

14  way that it has been billed.  Whatever the case is, it's

15  clearly a refusal to pay.  And a refusal to pay is

16  sufficient to create a conflict as defined by the Second

17  Circuit.

18          This is not something that it is simply an

19  inability to pay, and that we have taken a lot of money

20  and therefore we should, we took a chance.  This might

21  happen because of the nature of those assets.  That is not

22  the case here.  The case, what is being articulated to the

23  court is their refusal to pay, for whatever reason;

24  whether it's disagreements of the billing, or something

25  else.

40

1          So, I'll rest with those comments and

2    respectfully request that the application -- that the

3    recommendation be issued granting the application to

4    withdraw.

5          THE COURT:  All right, Mr. Ansanelli?  Yes.

6          Mr. Ansanelli:  Judge, I believe that Mark

7    Goidell from the firm has adequately addressed many of the

8    issues concerning billing.  What I want to focus in on is

9    the ethical issue before the court.

10         This problem with regard to pointing the finger

11   at others rather than taking personal responsibility has

12   been evident throughout our post-plea representation of

13   Mr. Romano.  However, it is most of the problem.  What

14   Mr. Romano wants this firm to do is abdicate a position

15   that we ethically can not do.  And that is, to point the

16   finger at the prosecution, point a finger at prior

17   counsel, point a finger at the court, point a finger

18   everywhere but back at himself in terms of where

19   responsibility ultimately lies.  And to make those points,

20   which are nothing more than a major distraction and

21   undermines the points that the court is aware that we need

22   to make concerning the sentencing enhancements, sentence

23   disparity, and all of the issues that go to proper

24   representation.

25         I've had this discussion.  I visited with

41

1  Mr. Romano numerous times in the jail.  I've asked, I've

2  implored, I've written, I've done everything one man can

3  do to ask him to take those issues that aren't important

4  to him, this whole conspiratorial system corrupt

5  philosophy, and perhaps write a book one day.  But to take

6  them off the table and allow us to do our job.  Because it

7  would -- those distractions, that lack of taking personal

8  responsibility for the actions that he was involved in,

9  will undermine any efforts that we can make on his behalf.

10          Although the payments of the firms bill is

11  important, it is not the central issue here.  The central

12  issue here is; even if the bills were paid up to date and

13  there was no issue with money, we still could not properly

14  advocate for this client.  I don't know how to go forward

15  in good faith on his behalf at this juncture with this

16  position being what it is.  I feel that at the end of the

17  day his directives which have been inconsistent

18  throughout, and now are quite clear; and that is advocate

19  a position that I ethically can not.  It's ultimately a

20  place I can not stand in.  And that's why we're asking to

21  be relieved.

22          THE COURT:  All right, I understand your

23  position.

24          Mr. Ansanelli:  I want to make one last point on

25  the fee issue.

42

1          This whole discussion with regard to Brian

2     Aryai.  Just so this court understands; it's also

3     unfortunately a distraction.  Mr. Aryai is a retired

4     federal treasury agent.  He is an accountant, not an

5     attorney.  We did not hire Mr. Aryai.  He was hired by the

6     Romano family prior to our involvement.  We did not pay

7     Mr. Aryai.  He is not under our wing.  The family, the

8     Romano family paid him whatever he billed, whatever he

9     asked for a retainer.  We did indicate, however, because

10    of prior working with Mr. Aryai on other cases, that we

11    would welcome his involvement with regard to forensic

12    accounting services that he could bring to the table.

13          To that extent we had an agreement, a typical

14    agreement bringing an accountant under the firm's wing for

15    purposes of attorney-client privilege, indicating that we

16    had that working relationship with regard to the Romano

17    case.  However, we did not direct his activities as has

18    been discussed today, his ongoing investigation, or

19    whatever he did down in Florida, where he had various

20    potential issues of prosecutorial misconduct that they

21    thought were appropriate.

22          We in fact informed the client on many occasions

23    that that was a distraction, and ultimately would make our

24    job much more difficult.  So I just want to give the court

25    that perspective.  And thank the court for its time today.

43

1  Thank you.

2          THE COURT:  All right, getting back to

3  Mr. Romano.

4          Part of what I'm hearing from counsel does

5  concern me for your benefit.  Even if you have other

6  attorneys representing you at sentencing, you're going to

7  continue to have this same problem with any attorney who

8  you're asking to advocate a position of prosecutorial

9  misconduct.  Do you understand that?

10          THE DEFENDANT:  I understand that, your Honor.

11          THE COURT:  Okay.  So the question is -- I mean

12  I realize having heard from you I understand how

13  passionate you feel about this.  The difficulty is, you

14  put an attorney who is representing you into an ethical

15  dilemma.  And the ethical dilemma becomes trying to point

16  out your experience in this process, which I see from your

17  discussion is not only very frustrating to you, but is

18  something that you believe and feel compelled to get out

19  on a public record here somehow.

20          There is a concept that we know of at this

21  point, and it's part of your sentencing proceeding itself,

22  that talks about acceptance of responsibility.  And when

23  you take a plea and certain things fall into place, you

24  get a reduction in the sentencing guidelines for

25  acceptance of responsibility.

44

1          You're putting that, that acceptance of

2   responsibility which you say you do admit, and again for

3   purposes of taking the plea you would be eligible to

4   receive the reduction on that basis.  But you also want

5   some accuracy here that even though you're taking

6   responsibility you're really saying you're very disturbed

7   with the performance and actions and conduct of the

8   prosecutor.

9          You've made some statements today before me that

10  lead me to conclude that you believe there is some sort of

11  conspiracy that went along here with regard to your

12  prosecution.  And you're essentially putting the defense

13  attorney between a rock and a hard place.  They can't

14  argue both of those positions.  Do you understand that and

15  do you understand why?

16          THE DEFENDANT:  I do, your Honor.  I don't

17  think -- I don't think I put Mr. Ansanelli in an arduous

18  position.  The conversation was for Mr. Ansanelli to give

19  me some sort of form, some sort of forum to put that on

20  the record.  Because I just -- I feel, honestly feel in my

21  heart what about the next guy.  Okay?  And you know what?

22  I don't care about the prosecutor.  I know whether you

23  know, she has a job to do.  I know, I read all kinds of,

24  all kinds of paperwork about prosecutors.  I just want to

25  put that on the record.  And Mr. Ansanelli knows that,

45

1   that's what I wanted to do.  The issue here is not about

2   any sort of ethics.

3           And as far as accepting responsibility and

4   getting some three points.  Your Honor, nobody knows

5   what's in my heart, and if I'm accepting responsibility.

6   Words aren't going to show that.  Okay?  I have accepted

7   responsibility for this.  And I have explained it in the

8   most simplest and honest terms to a PSI inspector -- I

9   don't know what you would call them.

10          THE COURT:  The officer who interviewed you?

11          THE WITNESS:  The officer who did the interview.

12  He put the three points back on.  He put the three points

13  back on, which of course I know that Mr. Ansanelli will

14  review.  But he said that I am distancing myself from

15  responsibility.

16          And you know, I don't know if saying what a

17  prosecutor is doing, or saying that something that's going

18  on within a courtroom and that I believe to be unfair to

19  me -- I think that should be addressed.  I think it should

20  be addressed.  I don't think there's some big giant coup

21  going on.  I know that the government has their job to do.

22          Our job has always been sentence mitigation.

23  There is a couple of glitches involved there where we

24  thought maybe we should pull the plea back.  There was the

25  Brian Aryai.

**46**

1    How Mr. Ansanelli can say that this man works

2    for me and me alone, when I'm sitting on a contract that

3    is signed by Mr. Ansanelli that says that Brian Aryai is

4    directed by Mr. Ansanelli's firm.  And you know, I'm not

5    sitting here making this stuff up.  I'm only speaking

6    about the facts.  The facts are, I have a contract saying

7    that.

8    Why do we go down that route?  Why would you

9    even entertain me with getting the -- catching a

10   prosecutor giving information that she shouldn't have to

11   an attorney that don't even work for, for one of the

12   cooperating witnesses any more.  You know?  I don't think

13   there's a -- I just wanted a forum.  I've put it out

14   there.

15   I don't have a problem with Mr. Ansanelli.  I

16   don't think that they want to represent me any more, not

17   because of ethical issues.  It's money.

18   THE COURT:  Let me stop you there.

19   The problem here is, they can't give you a forum

20   for what you want.  And I'm not sure that that is

21   resonating with you.

22   Because what you're asking them to do,

23   effectively, is to take contrary positions when they're

24   representing you for sentencing purposes.  It doesn't seem

25   contrary to you, but ethically it is contrary.  Because

47

1   what it's saying essentially is to the judge; yes, I

2   accept responsibility for what I did, but I think it's

3   important for you to understand that I believe this

4   prosecutor committed some ethical violations herself.

5   Which is really what I think you're saying here.  Correct?

6          THE DEFENDANT:  Yes.  But I don't believe that I

7   want to say it at that sentencing, while we're mitigating.

8   I believe we've created a forum now.

9          THE COURT:  I'm glad to hear that, because I

10  would have some real doubts about your common sense if

11  that were the case.

12         THE DEFENDANT:  I absolutely know that.  I

13  absolutely know that.  But by the same token I feel -- I

14  am not have a child that's going to sit in a courtroom

15  mute to people saying things that are untrue.  Or for

16  instance again today.  I mean there is a point.  And I

17  told Mr. Ansanelli while he was here, I said she never

18  produced this stuff.  I want someone to voice that.

19         And that's where, that's where we have a little

20  bit of a problem.  And maybe, maybe that I feel that you

21  need to meet force with force and Mr. Ansanelli takes a

22  different approach.  But I'm not a person that can't meet

23  half way with anybody.

24         THE COURT:  Well the meeting half way here, the

25  predicament is that what Judge Bianco is going to be

48

1    looking at, because he took your plea, so he certainly

2    heard what you allocuted as your plea.  Correct?

3              THE DEFENDANT:  Correct.

4              THE COURT:  He's also faced with this

5    presentence investigation report.  And typically he then

6    has the objections that are filed by your counsel along

7    with any presentation that your counsel intends to make

8    about other factors that counsel believes the court should

9    consider in formulating a sentence for you.

10             It's not a scenario where this issue of whatever

11   your beef is -- and again I understand exactly what it is

12   at this point -- where your beef with the prosecutor is

13   going to come up.  Judge Bianco is not going to be looking

14   at that.  He is going to be looking at the information

15   that is in front of him, and his own experience with you

16   based on what he heard in the plea; what he has read in

17   the report; what objections he has; and the preparation

18   and presentation that is made by your counsel with regard

19   to mitigation.

20             This other thing for the most part is really on

21   the back burner somewhere.  I don't know what you can do

22   with it eventually, or what you intend to do with it

23   eventually.  But asking counsel to deal with this, or to

24   let you say something about it during a sentencing

25   proceeding, it wouldn't matter if it is this counsel or 20

49

1    others sitting there, I can guarantee you that they're all

2    going to take the same position.  It puts them in an

3    ethical bind.  And their first duty is to you.  And to

4    allow you to do something like that where you could be

5    literally shooting yourself in the foot as far as

6    sentencing is concerned, is just not a place you want to

7    be.

8            And I think you know that.  And I understand

9    your frustration with this.  But if that's what you're

10   expecting them to do, or wanting them to do, it wouldn't

11   matter if I put seven other attorneys in that box, you're

12   going to have the same problem.  If I were practicing at

13   this point I would have a problem with it.  My job is to

14   represent you the best way I can, even when that means

15   telling you that the course of action you want to pursue

16   is not in your best interests.  Okay?

17           THE DEFENDANT:  Yes.

18           THE COURT:  One last word.

19           MRS. ROMANO:  I feel at this time that my

20   husband -- this has nothing to do with -- this to me is a

21   distraction of what the real issue is.  Mr. Ansanelli does

22   not want to be on this case any more because he knows that

23   his billing practices are off major-ly.  And I can sit

24   here with him any time he wants to go over the bills, line

25   by line.  The whole prosecutional misconduct to me is

**50**

1  something that my husband expressed to Mr. Ansanelli,

2  especially during a time that Mr. Ansanelli continually

3  goes to visit my husband in jail.  And for me and from my

4  impression is antagonizing a person who is already

5  incarcerated and asking him, putting him in a position of

6  asking him for money.  And then all of a sudden you have

7  somebody who is in a defense mode, okay, and he is

8  expressing himself.  I don't think we're ever going to be

9  addressing this.  I think this is the thing that is all

10  about money, your Honor.  And I just want to make sure.

11       THE COURT:  Well, I understand your position.

12  But it really isn't all about money.  I have heard myself

13  from your husband several times today that he has an

14  agenda he wants to address for sentencing purposes.

15       MRS. ANSANELLI:  Well, it's --

16       THE COURT:  Let me finish.

17       That he wants to address it for sentencing

18  purposes.  The only person who knows what he's thinking,

19  how he wants to proceed at this point is him.  I'm

20  listening to him.

21       MRS. ROMANO:  Right.

22       THE COURT:  If he's tells me he's prepared to

23  pass that for purposes of these proceedings, that's a

24  different story.  But I haven't gotten an affirmative yes

25  from him yet.

51

1          MRS. ROMANO:  And I can tell you from a

2   discussion that I had with him yesterday or Monday, and I

3   can't even think right now.  We discussed that.  We just

4   want to move forward with sentencing.  We want to get this

5   over with, and let's not be distracted by anything else.

6   And we want to keep Mr. Ansanelli as counsel, because we

7   think he is doing, he did a great job, and he has been

8   submitting stuff to the court.  But what I see happening

9   is that things stopped because of other moving pieces only

10  to see where we would go with it, not knowing what the

11  outcome would be.  But it boils down to money.

12          THE COURT:  Okay.  All right, I heard your

13  argument.  Thank you.

14          And I'm not saying that there isn't an issue of

15  money here, because it's perfectly clear that there is an

16  issue, because both sides have raised it.  So that both

17  sides is counsel and Mr. Romano raised it.

18          But the equally significant key to me here is,

19  whether or not you're in a position to take counsel's

20  advice in terms of doing what they believe is in your best

21  interests to give you the best foot forward in sentencing.

22  And which I believe, based on what I hear, that advice is

23  good advice.  And the question is whether or not you are

24  willing to abandon for the moment, at least for purposes

25  of the sentencing proceeding, the very strong feelings you

52

1    have with regard to this issue of what you've now put on

2    the record as prosecutorial misconduct.  So you have to

3    tell me that.

4            THE DEFENDANT:  Your Honor, I have been given my

5    forum.  I am satisfied.  I'm not going to press that

6    issue.  I know its a moot subject.  And I want

7    Mr. Ansanelli to represent me with mitigating

8    circumstances.

9            I have read most of the things that he has had.

10    I have actually written a lot of it, and they have edited

11    it.  I'm very happy with it, and I want to move forward.

12    And I also want to state, okay, and I know this doesn't

13    mean much.  And I know that people make promises in this

14    world that they can't keep.  I am a man of my word.  My

15    handshake -- my handshake would put lawyers out of

16    business.  Okay?

17            I have every intention of giving this man every

18    dime that's warranted.  I would pay him double just to

19    have things set straight for my story, and who I am as a

20    person be told to Judge Bianco.

21            I'm very happy with this man.  I want him on,

22    and I will try whatever tricks I have up my sleeve --

23    whether it's, I'll sell everything I have, none of these

24    materials things mean anything.  Money does not mean

25    anything to me.  I've given away millions.  I'll try my

53

1    best to get him paid.

2            But we do need to move forward.  And I think

3    Mr. Ansanelli knows that a lot of this was stopped not

4    because of -- because I don't want to proceed forward.  A

5    lot of it was stopped because he said he needs $150,000.

6    And to quote, he said he needed $50,000 certified check.

7    I have to tell you, your Honor, things do not work in the

8    same time frame in the real world as they do in the Nassau

9    County Jail.

10           THE COURT:  All right, I understand your

11   position.

12           And I think I've heard sufficient now as to

13   everybody's position.  I am going to take this under

14   advisement.  And I will issue a written decision without

15   revealing anything that I believe is inappropriate to

16   Judge Bianco with regard to his considerations going

17   forward with this trial, or in any way jeopardizing your

18   status here.  All right?

19           We have concluded then.  Thank you.

20           The minutes are sealed.

21           MR. GOIDELL:  Thank you.

22           Mr. Ansanelli:  Thank you, judge.

23           (The proceedings were concluded at 4:24 p.m.)

24

25